## THE HALLGRIM.

## THE HAVRE MARU.

Circuit Court of Appeals, Second Circuit.
July 19, 1927.

No. 307.

1. Collision ⟨⟩105(1)—Evidence held to show one ship solely at fault in daylight harbor collision, while maneuvering at slow speed.

Evidence *held* to fix liability on particular steamer for collision with another steamer in harbor of Kobe, Japan, in daylight, while both vessels were moving at slow speed.

2. Collision ⟨⟩35—Vessel's "course" is her apparent course, and not her heading at any particular moment.

A vessel's "course" is her apparent course, and not her heading at any given moment.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Course.]

Appeal from the District Court of the United States for the Eastern District of New York.

Libel by the Dampskibs Aktieselskabet Phœnix and another, owners of the steamship Hallgrim, against the steamship Havre Maru and the Osaka Shosen Kabushiki Kaisisha, its claimant, in which certain cargo owners intervened, and claimants filed cross-bill. From a decree (16 F.[2d] 483) for libelant and interveners in the main suit, and dismissing cross-bill, respondent appeals. Affirmed.

Appeal by the owners of a Japanese ship, the Havre Maru, from a decree of the District Court for the Eastern District of New York, holding that ship solely at fault for a collision in Kobé Harbor, Japan, between herself and a Norwegian ship, the Hallgrim.

The harbor of Kobé is to the southeast of the city, and protected by a breakwater in the form of an arc running roughly northeast and southwest, the convex side towards the city. On the afternoon of July 16, 1924, the Havre Maru was at anchor at some distance to the southeast of a beacon on the south end of the breakwater, and the Hallgrim was at anchor at Quarantine, southwest of the same point. Each vessel wished to change her position, the Hallgrim to move to buoy No. 18 about north of the north beacon of the breakwater, the Havre Maru to buoy No. 9 southwest of the south beacon.

The two vessels weighed anchor at about the same time, the Havre Maru turning around, so as to head about north, and the Hallgrim heading about northeast, on opposite sides of the breakwater. When the Havre Maru was a little south of the northerly beacon she starboarded towards the breakwater. For three minutes after this order she was under a steady helm. Meanwhile the Hallgrim was moving in a lane between the breakwater and a row of mooring buoys to the north of it; she was about 300 feet off the breakwater. Just before the Havre Maru came abreast of the north beacon she gave a two-blast signal, to which the Hallgrim answered with two. In compliance with these signals each ship starboarded, but whether the effect of the Hallgrim's starboarding was delayed because of her slow speed was a point at issue. The Havre Maru again blew twice, the Hallgrim answered; still a third time the Havre Maru blew twice, and the Hallgrim answered.

The place of collision was in dispute. The Hallgrim put it close to a Danish ship, the Annam, moored to buoy No. 17, which lay about 1200 feet northwest of the north beacon, which formed the end of the lane between the mooring buoys and the breakwater. The Havre Maru put it some 400 to 500 feet out from this buoy. Upon her third signal, and at some point whose position is disputed, the Havre Maru hard-astarboarded, and later reversed, and slipped her starboard anchor, the place of these being also in dispute. The Hallgrim shortly before the collision set her

engines, which had been at slow, full speed ahead, and straightened, or perhaps swung somewhat to starboard. Neither vessel had high speed at the time of the collision; the Hallgrim concededly was at low speed; the Havre Maru's speed was in dispute. The ships met at nearly right angles, the bow of the Havre Maru striking the starboard side of the Hallgrim about midships, careening her heavily to port, breaking through several plates, and otherwise severely damaging her. The Havre Maru's bow was twisted to starboard.

Hunt, Hill & Betts, of New York City (George C. Sprague and Edna F. Rapallo, both of New York City, of counsel), for the Havre Maru.

Haight, Smith, Griffin & Deming and John W. Griffin, all of New York City, for the Hallgrim.

Bigham, Englar & Jones and Leonard J. Matteson, all of New York City, for the Hallgrim's cargo.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

L. HAND, Circuit Judge (after stating the facts as above). [1] Of the disputed issues we think the most important are the place of collision and the heading of the Annam. The first is established by all the disinterested evidence, and was found by the judge to have been close beside buoy 17, where the Annam lay. The Havre Maru, as is in such cases to be expected, put it much further out in the lane, but the testimony of the Annam and of a British ship, the Ixion, leaves us no reasonable option but to accept the Hallgrim's version. The second issue is equally well proved except for the testimony of Smith, of the Ixion, who eventually said that the Annam was heading about south. The weight of the testimony is that she was heading southeast, again bearing out the Hallgrim.

The testimony as to the Havre Maru's speed is in irreconcilable conflict, to solve which we have the benefit of the usual calculations of the advocates, necessarily based upon the unreliable recollection of witnesses, unreliable, that is to say, except as to the total elapsed time and the distance between the place of starting and that of collision. The important question, which is the speed at collision, cannot be ascertained with any assurance. We find it unnecessary to do more than say that the very collision itself shows that the Havre Maru must have still had substantial way on. It is impossible that the

damage should have been caused to any extent by the Hallgrim's own way, because her port helm at the end, so far as it had any effect, would have thrown the point of contact away from the Havre Maru's bow; that is, unless the Hallgrim had an unusual pivoting point. True, the Havre Maru's bow was twisted to starboard, which probably indicates that the Norwegian ship had some motion; but this is a negligible feature. The Havre Maru, not being fully loaded, would not have had enough momentum to cause the injury she did, unless her speed was real. This also accords with the testimony of the disinterested witnesses, and incidentally serves again to discredit the story of the Havre Maru.

[2] Coming, then, to the duties and faults of the two ships, we think that it does not matter whether it was originally a crossing, or a passing, case. In either event we believe that the Havre Maru was in fault, and grossly in fault. We are content for argument to assume with her that it was a crossing case, but we are not content to assume that she held her course and speed. The appellant's mistake in this contention rests upon a misconception of The Victory, 168 U. S. 410, 18 S. Ct. 149, 42 L. Ed. 519, The Arrow, 214 F. 743, 745 (C. C. A. 2), Lake Erie Transp. Co. v. Gilchrist, 142 F. 89 (C. C. A. 6), The Waldo, 100 F. 502 (C. C. A. 6), The Velocity, L. R. 3 P. C. 44, The Esk, L. R. 3 P. C. 132, The Roanoke, 11 Asp. M. C. 253, The Bellanoch [1907] L. R. p. 170, The Echo [1917] L. R. p. 132 and my own two decisions, The Napoli and Lehigh Valley Transp. Co. v. Central R. R. of N. J., 12 F.[2d] 130, note. These cases do indeed establish the rule that a vessel's course is her apparent course, and not her heading at any given moment. We have just so decided in Commonwealth & Dominion Line v. U. S., 20 F. (2d) 729. It does not, however, follow from this that a master is called upon to divine the purposes of a meeting vessel, and at his peril to anticipate where she will be in accordance with her undisclosed purposes. Nothing would more completely disrupt any possibility of navigation than such an application of this rule. Until the Havre Maru had begun to starboard into the lane, the Hallgrim had no possible means of knowing where she was bound. She might equally well have been passing to the piers, or to a mooring buoy to the north, for, as the appellant is at pains to assert, travel was also across, as well as up and down, the lane. Assuming that the Hallgrim was the giving way vessel, and

should have gone under the Havre Maru's stern, she was under these circumstances bound to assume, and indeed authorized in assuming, nothing as to the other ship's course, except as it was revealed by her heading and movement up to that point, until in some way she had shown her purpose. It is not as though, like the Port Phillip in Commonwealth, etc., Co. v. U. S. (C. C. A.) 20 F.(2d) 729, she had carried a signal showing her destination. She appeared only as a vessel headed across the Hallgrim's bows.

The Havre Maru's first signal should not have been taken as a declaration of her course; no such signals are provided in the International Rules. It meant that the Japanese ship was directing her course to port, and therefore changing it. Had that course down the lane been already evident, she was bound to follow it in silence; had it not, she was equally bound to keep her apparent course—that is, a steady helm. She could not at once assume the character of a holding-on ship, and signal that she was directing her course to port. Such a contention confuses course with heading. She had four possible alternatives open to her: To treat her course down the lane as already manifest and to starboard in silence; to keep her helm steady and to cross the Hallgrim's bows; to stop and back behind the breakwater, allowing the Hallgrim to cross her own bows; to do what she did. The first would have been improper, because her apparent course did not involve starboarding. The second would have carried her where she could not have made her turn. The third and fourth were an abandonment of her duties as a holding-on ship, and must be justified only on the theory that the case was one of special circumstances. The third was the safest, and would certainly have been proper. The fourth may have been equally justified; but, if so, it was because, as we have said, the situation had become one of special circumstances. We think, in spite of the appellant's argument to the contrary, that the Newburgh, 273 F. 436 (C. C. A. 2), equally applies to this situation arising under the International Rules.

This released the Hallgrim from any duty to pass under the Havre Maru's stern; if she remained in any sense the giving-way ship, she was bound to no more than any reasonable navigation which would keep out of the way. Probably, as matters turned out, the Hallgrim's best course was to hug the breakwater by porting still further. This, however, the Havre Maru did not then expect, and does not now charge as a fault. Each vessel looked to a starboard passing,

and each did something to execute it. So the Hallgrim answered with two blasts, after which the ships were in accord, not because signals are to be used for an agreement, but because the mutual navigation thus disclosed could not have meant anything else. The second and third exchanges should have meant, and did mean, further starboarding by each; but they did not affect this accord.

If we are right as to the point we have fixed for the collision, the Havre Maru did not do her part in this agreement. Although the Hallgrim gave her all that was possible of the lane, she had not completed anything like the swing to port which was essential to clear. This was almost certainly due to her failure to hard-astarboard at once, or indeed until she was in the jaws of collision. Unless the whole undertaking was impossible from the beginning, which nobody suggests, and which would put her in the grossest fault, she completely neglected her duties. Her first excuse is that she thought there was no danger until it was too late, which condemns her as well as anything could. Her second is that the local harbor rule forbade her going down the east side of the breakwater. That rule may indeed have required her to give the beacon a wide berth, but her position was such that this was inevitable anyway; she had no power to make a sharp turn around the beacon. Besides, the rule was clearly made to give room for other craft coming up from an opposite direction, and as none were there, it imposed upon her only a purely formal duty in this instance. Moreover, with all such questions we have absolutely nothing to do. If her scruples forbade her to swing around nearer the breakwater, the time to heed them was before she undertook a starboard passing at all. The one unredeemable course for her was to assume such navigation and then fail in it. That she indubitably did.

The Hallgrim, on the other hand, does not seem to us at fault. It is true that her engines remained stopped for some time after she got the first signal, though she still had steerageway. Perhaps this kept on for as much as two minutes. Nevertheless we will not speculate as to the effect of it, because at the time of collision she had moved as far over to the westward as she could get without leaving the lane altogether and passing to the west of buoy 17. If she was at fault, it was because she did not so pass, and this, indeed, is one of the charges made against her by the Havre Maru. Yet the latter's master, though at first he did not know on which side of the buoy the Hallgrim would pass, at no time assumed that she would so navigate,

and did not understand that he was to have the whole lane to himself. If he had, it would have been quite without warrant. We are to remember that the Norwegian ship could not swing under the Annam's stern like a small boat. Her turning circle would have carried far up to the north, probably into too shallow waters; certainly far away from her mooring, to which she could only have returned after a complete circle. If she had not been content with such a preposterous maneuver, she must have backed and filled in narrow berths until she could have worked herself around. Manifestly, unless it became plain, or should have become, that the Havre Maru could not pass in the lane, it would have been absurd for the Hallgrim so to entangle her navigation.

The case is curious, in that every one present assumed that there was room in the lane for a starboard passing, when, so far as we can see, in fact there was not. The Havre Maru, even at speed and under a hard-astarboard helm, could not have swung clear of the Hallgrim in the lane, unless the turning circle was much shorter than is usual. A vessel of her size requires nearly 650 yards "advance" and 400 yards to port to change her heading eight points. Knight, plate 93. If she really was where she says, and where the Hallgrim agrees she was, and if she was headed so that she must swing eight points to pass, she would have cut close to buoy No. 17 and finished the swing to the westward of the line of mooring buoys. Obviously there is some mistake in her location, for we cannot suppose that all the mariners who were there were wrong in their estimates.

The question concerns the Hallgrim's navigation only in this wise. The first signal of the Havre Maru did not inevitably involve a starboard passing; it was consistent with a port, which so far as we can see would have been safer. But, as we have said, this is not charged as a fault. The Havre Maru must say that, after the ships began to maneuver, the Hallgrim should have seen that a starboard passing, though initiated by her, was impossible unless the Hallgrim passed west of the buoy, no matter what difficulties that might entail in her navigation. This in effect is equivalent to saying that it was a fault not to recognize later as unsafe what it was not a fault to recognize at the outset. The Havre Maru, being on this hypothesis necessarily at fault in the first place, is in no position to make such a contention. We cannot decide cases on such tenuous considerations, in the face of the unanimous testimony of those present. Only the most apparent

danger required the Hallgrim to run to a cover from which she must extricate herself as best she could.

The final navigation of the Hallgrim was proper, or at least fairly within the choices left open by the Havre Maru. It is argued that she should have backed and slipped her anchor. Possibly that might have been better; probably it would not. She was heavily laden, and, as it was, got half her length past the Havre Maru's stem. At what moment it became, or should have have become, apparent to her that the Havre Maru could not clear her, it is impossible to say. Whether at that moment, whenever it was, it was better judgment to try to save the day by checking her speed, or by going ahead as fast as she could, is again beyond estimate. But we may, and indeed must, say that a ship, forced into such a predicament by the quite unjustified conduct of another, has not to answer nice considerations of the kind now advanced.

So far as we can see, the collision was wholly without excuse, and the Havre Maru was altogether at fault. It is true enough that a collision in broad day, the ships at slow speeds and unhampered by other moving craft, would ordinarily be chargeable to each. In such a case we look with some care at a ship placed as the Hallgrim was here. But, for the reasons given, we think that no fault has been proved against her; that, on the contrary, she has established that she was so far driven into a corner as to endanger the Annam, and could do nothing more to escape.

Decree affirmed.