## THE OVERBROOK.

### In re PENNSYLVANIA R. CO.

#### No. 197.

Circuit Court of Appeals, Second Circuit.
Feb. 16, 1931.

594

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Chauncey I. Clark and C. B. Manley O'Kelley, both of New York City, of counsel), for Pennsylvania R. Co.

Barnes, McKenna & Halstead, of New York City (Bernard C. McKenna, of New York City, of counsel), for claimant-respondent Louise O. Weischadel, administratrix of Charles Weischadel, Deceased.

John R. McMullen and Foley & Martin, all of New York City, for Cleary.

Alexander, Ash & Jones, of New York City, for appellee Fullerton Barge Co.

Bigham, Englar, Jones & Houston, of New York City (Edward Ash, Max Taylor, and Chas. W. Hagen, all of New York City, of counsel), for appellee National Fireproofing Co.

Macklin, Brown, Lenahan & Speer, of New York City (Horace L. Cheyney, of New York City, of counsel), for appellees Charles E. Lewis, Anthony O'Boyle and Moore Transp. Co.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

CHASE, Circuit Judge (after stating the facts as above).

If we forego using what may, perhaps, be no more than knowledge after the event and charge the captain of the Overbrook with no duty to round to after he first saw the obstruction buoy, charge him with no duty to go nearer than 250 feet to the Brooklyn shore before he starboarded to whip his tow in line to make the passage between the drill boat and the Brooklyn side, and charge him with no duty then to do more than he did do after rounding the Hook to prevent going up the river with his tow tailing out nearly broadside on the tide, we cannot overlook navigation which was bound to put him in that dangerous and unfortunate situation in the not unlikely event that, when he rounded Corlear's Hook, something, not necessarily a submerged wreck by any means, would make it necessary for him to change his intended course between the drill boat and the Manhattan shore and go on the Brooklyn side of the drill. So well known is it that the East River carries heavy water-borne traffic, that it is apparent that this captain could not know until he rounded the Hook whether the course he preferred was open to him or not. No doubt he may be absolved from any duty to count upon the presence of an obstruction buoy in his course, though that was not beyond the realm of possibility, but he might well have met, quite within the realm of probability, other navigation which would have as effectively barred him from his chosen course. Yet, with this ever-present likelihood confronting him, we find him deliberately choosing to round Corlear's Hook, not at or near mid-channel, where he would have a reasonable chance to set his course successfully for either passage past the drill boat, but within 150 feet of the Hook. This rounding gave him the advantage of cutting the corner, so to speak, and would have helped him to go where he wanted to, but he did not know then whether that course could be taken and could not know it until he could see around the bend; but he did know that he was making it extremely difficult, if not impossible, to take the only other course past the drill boat should he have the misfortune to find the Manhattan side for any reason unavailable to him. He knew the tide and the effect it would have on his tow. He knew the tow would tail out as it did if he had to go, from where he deliberately placed himself in rounding the Hook, toward the Brooklyn shore in an enforced effort to pass the drill boat on that side. Desperate maneuvers to extricate himself from a desperate situation may well characterize his conduct after he saw the buoy, but, if he was acting then in extremis, his previous fault is wholly responsible for it. A peculiarly apt illustration of this is found in The Black Diamond (C. C. A.) 273 F. 811. In that case the tide was ebb instead of flood, and the obstruction encountered not a submerged wreck, but a tug

and tow. The Black Diamond was going up the river with a loaded car float in tow, and was held at fault for being on the left of mid-channel in violation of the East River statute, New York Laws 1848, c. 321, p. 450, § 1, and for the collision with the tug and tow coming down. The Transfer No. 6 backed out of her slip as the Black Diamond came on, and, in avoiding her, a swing out into the river was made into the resulting collision. The fault of the Overbrook's captain goes beyond a violation of the statute, however. He knew what the statute did not contemplate at all, that the river was divided into two possible passages for him by the drill boat. He quite improvidently deprived himself, by hugging the New York shore around the Hook, of the opportunity of safely taking one of them. Had he been at mid-channel, or to the right of it, the obstruction buoy would not have troubled him, for he could have taken the Brooklyn side of the drill boat as well with it there, since it would not then have been in his way. Should we go back a step farther and assume that the size and weight of his tow required him to go only, as he intended, to the Manhattan side of the drill boat (and that has not been proved), he was plainly at fault for not having a helper tug which would have enabled him to take the only course which would have been open to him in the event that the one of his choice was, as proved to be the case, obstructed. No facts here shown excuse his failure to have his tow under control. See The R. J. Moran (C. C. A.) 299 F. 500.

The District Court having found the Overbrook at fault on evidence which supports that decision, the decree is affirmed.