## THE BERN.

### In re READING CO.

### Appeal of EXPORT S. S. CORPORATION.
### No. 43.

Circuit Court of Appeals, Second Circuit.
Dec. 10, 1934.

See, also, The Nellie Murray (D. C.) 6 F. Supp. 962.

Haight, Smith, Griffin & Deming, of New York City (Henry M. Hewitt and Charles S. Haight, Jr., both of New York City, of counsel), for appellant.

Macklin, Brown, Lenahan & Speer, of New York City (Horace L. Cheyney, of New York City, of counsel), for appellees Reading Co. and Tice Towing Line, Inc.

Purdy & Purdy, of New York City (John E. Purdy, of New York City, of counsel), for appellees Bouchard Transportation Co., Inc., Michelson Coal Corporation, Western Assurance Co. of Toronto, New York Steam Corporation, Margaret K. Fetherston, and Sargent Barge Line, Inc.

Bigham, Englar, Jones & Houston, of New York City (Andrew J. McElhinney, of New York City, of counsel), for Madeira, Hill & Co.

Foley & Martin, of New York City (James A. Martin, of New York City, of counsel), for appellees Murray Transportation Co. and Anthony O'Boyle.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

SWAN, Circuit Judge.

This litigation arises out of a collision in the East River, just above Corlears Hook, which occurred on the evening of January 15, 1930, shortly before 8 o'clock. There was a flood tide of about 3½ knots; the night was clear. The tug Bern was proceeding up stream, with twelve loaded coal barges in tow, at a speed over the ground of 5 or 6 knots. Her tow was on hawsers of about thirty fathoms and was made up three barges abreast in each of the first three tiers, two in the fourth tier and one in the fifth. Hence the length of the whole flotilla was probably about 750 feet. In accordance with the Pilot Rules, the Bern carried three staff lights to indicate a tow of more than 600 feet in length. The barges also carried proper lights. A helper tug, Perth Amboy No. 1, was in attendance on the starboard side of the second tier. Opposite Grand street, the port hawser barge of the tow collided with the bow of the steamer Exbrook, which was proceeding down the river with the tug Revere hanging to her port bow. Six of the coal barges were sunk. Owners of lost or damaged barges and owners of lost or damaged cargo brought libels against the Exbrook, the Bern, and the Perth Amboy No. 1; petitions for limitation of liability were filed by Reading Company, as owner of the Bern, and Tice Towing Line, Inc., as owner of Perth Amboy No. 1. The several suits were tried together and consolidated. An interlocutory decree was entered in the consolidated cause exonerating the Perth Amboy No. 1, holding the Bern and the Exbrook equally at fault, and granting the Reading Company limitation of liability. The faults ascribed to the Bern were violation of the East River statute (Laws N. Y. 1882, c. 410, § 757) and failure to have her tow under control. The Exbrook was held for not stopping more promptly. The Exbrook's owner has appealed, and the Bern's owner has filed cross-assignments of error; each contending for its own vessel's freedom from fault.

■ The vessels sighted each other when the Exbrook was passing under the Williamsburg Bridge and the Bern was off the south end of Corlears Hook and well on the Manhattan side of the river. They were 1,200 or 1,400 feet apart. The Exbrook was nearly in the center of the river, favoring the Manhattan shore, and was under a slight port helm and heading toward Corlears Hook. Her speed over the ground was about 3 knots. The Bern sounded a one-blast signal which the Exbrook answered with one, putting her helm slightly more to port. Because of the bend in the river, she could see only the head barges of the tow, but the Bern's staff lights told her of its length. Less than half a minute after the signals were first exchanged, they were repeated. Immediately thereafter both vessels sensed danger. The Bern sounded an alarm and kept on under full speed in an effort to pull her tow out of the way and toward the Brooklyn shore. The Exbrook stopped her engines and ordered the tug Revere to push her bow further to starboard. She did not, however, reverse her engines for a full minute after they were stopped. In "less than a minute" thereafter the collision occurred. The District Court found that the Exbrook had little, if any, forward movement at the moment of collision, and that her bow came into contact with the port side of the port hawser barge about 10 feet aft of the bow. All the witnesses agree that the place of the collision was about opposite Grand street, so that the Exbrook, a vessel 400 feet long, had proceeded down stream only a little more than her own length after the first signals were exchanged. Whether she was as near the Manhattan shore—350 to 400 feet—as the District Court placed her, seems to us doubtful, but, even if she were somewhat further out, her fault would be equally apparent. Her pilot acceded to an admittedly dangerous maneuver, relying on the Bern, who had proposed it, to get her

tow out of the way. He was charged with knowledge of the length of the approaching tow, even though he could see only the head barges, and knew that they were near the Manhattan shore; upon the first exchange of signals the Exbrook should have held back, which she could easily have done against the head tide—and particularly with the Revere to help her—until the tow could get safely past the Hook. Even if counsel's explanation of the pilot's testimony before the local inspectors were to be accepted, he concededly sensed danger on the second exchange of signals. It was certainly a fault at that time not to reverse his engines. The Benalla, 45 F.(2d) 864 (D. C. S. D. N. Y.). Neither error was made in extremis.

Although the testimony was in conflict as to the tow's position in the river, there was abundant evidence that the Bern was well over toward the Manhattan shore as she approached Corlears Hook. However, the narrow channel rule does not apply at this point in the East River. Inland Rules, art. 25 (33 USCA § 210). The Wrestler, 232 F. 448, 450 (C. C. A. 2). Navigation is governed by the East River statute which requires vessels to proceed as near as possible in the center of the stream. The District Court correctly found that the Bern was violating the statute. If the Bern's unlawful course was a contributing cause and not merely a condition of the collision, she must be held. See The Syosset, 71 F.(2d) 666 (C. C. A. 2), where numerous cases are discussed. On that record the violation was held not to be a cause; the colliding vessels were in a position for a starboard to starboard passing which could have been safely effected but for the Sagamore's unexpected sheer. The collision was caused by that sheer, and the Syosset's presence near the Brooklyn shore in violation of the statute was not a contributing cause, but a mere condition. We think the case at bar is distinguishable. Here the Bern's course in coming up so close along the shore as to box in any vessel which might be met at Corlears Hook created a situation of danger. Cf. The Overbrook, 47 F.(2d) 593 (C. C. A. 2). The Exbrook was forced to execute some maneuver to avoid it, and her negligence in failing to act promptly does not exonerate the Bern, for the dangerous situation created by her unlawful position continued to the moment of collision. It was rightly held to be a contributing cause of the collision; hence the Bern must share responsibility.

This fault is sufficient to condemn her regardless of the other fault ascribed to her,

namely, losing control of her tow so that it tailed toward the Manhattan shore. This finding rests upon the premise that the tide above the Hook makes straight up stream. But much the best evidence of the set of the tide is a chart from the United States Army Engineers' office, which shows that the tide runs true, making a turn out and away from the Hook, just as one would expect. The set of the current as shown by this chart necessarily precludes a conclusion that the barges were tailing toward Manhattan; though perhaps they might so appear to those on the Exbrook, if the Bern was heading diagonally across the river and close-cutting the point of the Hook, as we think was the fact. The porting of the Bern's wheel might haul the port hawser barge slightly to starboard and make it possible for contact to occur as the District Court found it did, but we cannot see how the tail of the tow could have been carried toward the Manhattan shore. All this is immaterial as respects the liability of the Bern, which must be held in any event for the reasons already stated. But it would have a bearing on the liability of her helper tug. If the tow was out of line it would be the duty of Perth Amboy No. 1 to straighten it. She, however, was conscious of no danger until the Bern sounded alarms. Thereafter she attempted to get a line on the third tier to draw the tow away from the approaching steamer but had not sufficient time to make the line fast before the collision occurred. We see no respect in which Perth Amboy No. 1 was proved to be at fault.

Error is assigned to the vacation of orders dismissing the libels filed by Murray Transportation Company and Anthony O'Boyle, owners of two of the lost barges. The orders of dismissal for lack of prosecution were entered after prosecution of the suits had been stayed in the limitation proceedings. The appellant contends that the restraining orders in the limitation proceedings did not stay prosecution of the libels as against the Exbrook; that neither tug had appeared or been brought in by process; that consequently the libels remained suits wholly between the libelants and the appellant as claimant of the Exbrook; and that, even if it be assumed that the tugs were parties, the libelants' proctors were not prevented from obtaining orders of severance and continuing the litigation against the Exbrook. But, in the absence of an order of severance, it was clearly an error of the clerk to place these libels on the general calendar call under local Rule XXXIII. Such an error may be

corrected even after the term has expired. United States v. Sterling, 70 F.(2d) 708 (C. C. A. 2).

Decree affirmed.