THE M/V SANDMASTER.

THE PATCHOGUE.

THE CHICAGO.

THE L. I. NO. 21.

THE PATCHOGUE.

THE P. R. R. NO. 566.

District Court, S. D. New York.
Dec. 3, 1938.

Kirlin, Campbell, Hickox, Keating & McGrann and Robert S. Erskine, all of New York City, for the Sandmaster.

Burlingham, Veeder, Clark & Hupper, Chauncey I. Clark, and Adrian J. O'Kane, all of New York City, for The Patchogue and carfloats L. I. No. 21 and P. R. R. No. 566.

Lynch & Hagen, Charles W. Hagen, and Henry C. Eidenbach, all of New York City, for The Chicago.

LEIBELL, District Judge.

On October 5, 1937, at about 7 P. M. the M/V Sandmaster collided with two car-floats, Long Island Railroad No. 21 and Pennsylvania Railroad No. 566, in the tow of the Long Island Railroad tug Patchogue. The collision took place in the East River at a point about 150 feet off the easterly corner of Pier 3, Brooklyn, after the Sand-master had just missed colliding with the tug Chicago and her carfloat No. 2913 about half way between that point and the Brooklyn Bridge.

A libel was filed by Construction Aggregates Company, as chartered owner of M/V Sandmaster against the Patchogue, January 3, 1938. By an order of the Unit-ed States District Court for the Northern District of Ohio, entered on April 15, 1938, the suit was permitted to proceed in rem against the tug Chicago, which is claimed by the Trustees of the Erie Railroad Company. Libels were also filed by the Long Island Railroad, as owners of carfloat No. 21, and the Pennsylvania Railroad Company, as owner of carfloat No. 566 against M/V Sandmaster, in which the tugs Pat-chogue and Chicago were impleaded. No notice of the surveys held shortly after the collision was given the Erie Railroad and no claim was made against the Erie until December 2, 1937. The three libels were tried together at the October 1938 Term of this Court. After a consideration of the evidence and of the briefs filed by the proctors I have reached the conclusion that all three vessels were at fault and that the Sandmaster, the Chicago and the Pat-chogue should bear an equal share of the damages sustained by the libelants in each suit.

On October 5, 1937, the M/V Sand-master, a sand carrier, with sand sucker equipment, loaded a cargo of sand at a point near No. 16 gas buoy on the easterly side of Ambrose Channel entering New York harbor. She left there about 5:25 P. M., entered the harbor and came up Butter-milk Channel at about mid-channel, between Governor's Island and the Brooklyn docks. Her destination was Twin Islands in Pel-ham Bay. There was a strong flood tide and good visibility, although night had set in. After entering the East River and at about Pier 8 Brooklyn she passed some other harbor traffic and hauled over to-wards the right. Her engines were operat-ed from the pilot house and were set at three-quarters speed. Her speed over ground was about 7 miles. There is a bend to the right in the East River at the Brook-lyn abutment of the Brooklyn Bridge. When opposite Pier 4 Brooklyn, below the bend, the Sandmaster was about 350 feet off the pier, her bow was about 900 feet below the Brooklyn Bridge. In that posi-tion at about 7 P. M. she sighted the tug Chicago with a carfloat on her port side coming down the East River about 200 feet off the Brooklyn docks, about opposite Pier 3, with the bow of her floats about 500 feet above the bridge. Immediately behind the Chicago, back about 500 feet, was the tug Patchogue with two carfloats, one on each side. The bows of the Patchogue's floats were then about 50 feet this side of the Manhattan Bridge. The distance between

the Sandmaster and the Chicago was approximately 1600 feet, allowing for the width of the Brooklyn Bridge. That part of the East River between the Manhattan and Brooklyn Bridges is about 1200 feet wide. The distance between the bridges, measured about 200 feet off the Brooklyn shore, is about 1400 feet.

The dimensions of the vessels and their horse power are as follows:—Sandmaster—251 feet long; 43.5 feet beam; 18.2 feet depth; 1200 horse power; 1849 gross tons; 1030 tons net: Patchogue—90.5 feet long; 24.5 feet beam; 11.16 feet depth; 750 horse power; 190 gross tons: Chicago—83.6 feet long; 23.4 feet beam; 12.4 feet depth; 500 horse power; 140 tons gross; 95 tons net.

The Patchogue had left Long Island City at 6:15 P.M. for Greenville, New Jersey. She had two carfloats lashed one on each side of her—pointing towards each other at the bow, at which point they were only about 3 feet apart. The starboard float was 325 feet long and extended about 8 feet beyond the port float which was 290 feet long. There were box cars on both floats. The bow of the Patchogue was at about the middle of the floats. Each carfloat was 40 feet wide and had 3 tracks. The Patchogue's captain standing in the pilot house was about 5 feet above the carfloats.

The Chicago had left 149th Street and the Harlem River bound for Jersey City. The carfloat of the Chicago was 272 feet long and was lashed to the port side of the tug at about the middle. Her captain standing in the pilot house was about 3 feet above the box cars.

In endeavoring to determine the location of the three vessels at various times after they sighted one another up to the time of collision, I have been faced by the usual problem in admiralty cases referred to by Judge Manton in The Reno, 2 Cir., 61 F.2d 966, at page 967:—"Thus there was presented the usual contradictory testimony of everyday occurrences in admiralty cases".

The parties to this litigation are however in agreement on a few points. All agree that at the time they mutually came into view the Sandmaster was below the Brooklyn Bridge about off Pier 4 Brooklyn, although the distance she was off the pier varied between 300 feet as testified to by the Sandmaster's witnesses to 600 or 700 feet as testified to by the Chicago and Patchogue witnesses. The master of another tug estimated the distance as 500 feet. I believe that subsequent events justify the conclusion that at that time the Sandmaster was about 350 feet off Pier 4 and her bow was about 900 feet below the Brooklyn Bridge.

The parties also agree that at that time the Chicago was some place between the Manhattan and Brooklyn Bridges off the Brooklyn docks, but as to how far off the docks and at what point above the Brooklyn Bridge they do not agree. Witnesses for the Sandmaster place the Chicago at 200 to 300 feet, 400 feet and 500 feet off the Brooklyn shore and as 200 feet, 300 feet, 400 feet and 500 feet above the Brooklyn Bridge. The crew of the Chicago testified that when the Sandmaster was sighted the Chicago was 100 to 150 feet off the Brooklyn shore in the vicinity of Pier 3. The middle point of the outer end of Pier 3 is about 625 feet above the Brooklyn Bridge, but since they diverge facing Manhattan the distance would be greater the farther off the pier the measurement is made. The float lashed to the port side of the Chicago was 272 feet long. In view of subsequent developments in their navigation in respect to each other, I am of the opinion that the Chicago's float was about 200 feet off Pier 3 and the bow of the float was about 600 feet above the Brooklyn Bridge.

As to the Patchogue, all parties agree that she was about 500 feet behind the Chicago, with their port floats in line, but the Sandmaster's witnesses place the Patchogue as just completing passing under the Manhattan Bridge, while the Patchogue and the Chicago place the bows of the Patchogue's floats as just coming out from under the Manhattan Bridge. I believe that when the Patchogue sighted the Sandmaster the port float of the Patchogue was about 200 feet off the Brooklyn docks and the bow of the float was about 50 feet west of (below) the Manhattan Bridge.

The tugs and their tows were making two knots over ground against the flood tide. The Sandmaster was doing about seven knots over ground in my opinion, although on that point the testimony is also conflicting, the Sandmaster contending she was doing less than seven knots over ground and the Chicago claiming the Sandmaster was doing at least eight knots. She had been averaging eight knots on the run from Ambrose Channel.

All parties agree that the tide was at flood, heading up the river, that visibility

was good and that there was a light south-easterly wind. No question of lights is involved and apparently all three vessels sighted each other in due time.

There is a great difference in the testimony of the crews as to the whistles blown, the order in which the signals were blown, and the position of the vessels at the time. The majority of the witnesses agree that the Sandmaster blew first, one whistle, for a port passing and that the Chicago answered with two whistles and an alarm, although some thought the alarm came first and then the two whistles. Several alarms were sounded and the two vessels repeated their first signals, the Sandmaster for a port passing, the Chicago for a starboard passing. The signals were exchanged probably about a minute after they sighted each other. When the Sandmaster blew one she started going to her right towards Brooklyn. When the Chicago blew two she went to her own left, also towards Brooklyn and increased her speed.

The bows of the Sandmaster and the bow of the Chicago's float passed each other at a point about 250 feet above the Brooklyn Bridge and the bow of the Sandmaster passed the stern of the Chicago's float at a point about 400 feet above the bridge. At that time the Patchogue and its flotilla were about 400 feet away and were also heading towards the Brooklyn shore. That was also the heading of the Sandmaster, which was then out of control as a result of her maneuvers to avoid the Chicago. The bow of the Sandmaster struck the starboard corner of the port float of the Patchogue and as both swung towards each other the bow of the starboard float struck the port side of the Sandmaster forward. The coupling of a freight car on the starboard float became entangled in the Sandmaster's rail. When the Patchogue backed away the freight car hung momentarily to the port side of the Sandmaster's bow and then dropped in the river and floated off.

The Patchogue's captain testified that he blew two whistles when he first saw the Sandmaster's red light, and that the Sandmaster had not passed the Chicago at the time. He thought the Patchogue and Sandmaster were 1100 feet apart at the time but later he changed this to 600 feet. The captain of the Sandmaster testified that the first signal he got from the Patchogue was two whistles, after the Chicago had passed the Sandmaster.

The Patchogue's deckhand, who was in the pilot house with the captain, testified that she blew two to the Sandmaster when the Sandmaster was passing the Chicago and that at that time the Patchogue's engines were going full speed ahead. The engineer of the Patchogue testified that the engines of the Patchogue were in reverse for two or three minutes before the collision, but there were no log entries to support this. The deckhand and the captain of the Patchogue testified to the same effect. I do not believe that the Patchogue was backing for any such time. I am convinced that she did not blow any signal until the Sandmaster cleared the Chicago.

When the Chicago cleared the Sandmaster, the captain of the Sandmaster put his wheel amidship and both engines astern. Then both the Patchogue and the Sandmaster blew danger signals and backing signals. Apparently the headway of the Patchogue and the original headway and swing of the Sandmaster, augmented by the force of the tide, and the heading of both vessels at an angle towards the Brooklyn shore, resulted in the collision.

The collision took place at a point about off the upstream (easterly) corner of Pier 3, Brooklyn, about 150 feet off the pier and 700 feet above the Brooklyn Bridge. It was sufficiently far off the piers to permit the Patchogue after the collision to turn her floats to port and go back up the river along the Brooklyn docks. After the collision the Sandmaster swung around to starboard and came down along Pier 3 where the Arbuckle watchman saw her lying about 25 feet off Pier 3, with some 75 feet of her bow extending down stream below the most westerly corner of the pier.

All three vessels were violating the East River statute at the time they sighted one another. However, the tugs and their tows were closer to the Brooklyn shore than was the Sandmaster. A starboard to starboard passing was the more practicable at the time, although a port to port passing was not impossible. The Sandmaster had two propellers and was not difficult to maneuver through the engine control in the pilot house. The Sandmaster blew to the Chicago for a port to port passage and began swinging to starboard, towards the Brooklyn docks. This started the trouble. The Chicago fearing some danger from such a maneuver, answered for a starboard to starboard passing and blew an alarm and then

went full speed ahead, veering first to port and then straightening up a bit so as to get her float's starboard stern out of range of the Sandmaster's bow. The Sandmaster by manipulating her two engines, backing full speed on the port engine and going full speed ahead on the starboard engine, was able to check her swing to starboard and move her bow somewhat back towards port. The Chicago passed within about 10 feet of the port side of the Sandmaster's bow. I think that the fact that these two vessels were able to pass starboard to starboard, even after the Sandmaster had begun a swing to the right for a port to port passage, shows how much more practicable it would have been for both vessels to have passed starboard to starboard in the first instance.

■ A starboard to starboard passage in the first instance was the proper course for the Sandmaster to take for another reason. That reason was the Patchogue which was following the Chicago only 500 feet astern, with a carfloat on each side. The Sandmaster had to navigate in respect to both these flotillas. If the Sandmaster had taken a course towards the middle of the river when she sighted the tugs and their floats she would have safely passed both the Chicago and the Patchogue. Apparently what the Sandmaster tried to do, was to have the Chicago and the Patchogue move out towards midstream, so that the Sandmaster could move in closer to the Brooklyn shore, on the assumption that the narrow channel rule for meeting vessels applied, calling for a port to port passing. The captain of the Sandmaster did not know that the East River statute applied and in fact did not know what that statute was. The narrow channel rules (33 U.S.C.A. § 210) do not apply to this section of the East River. Navigation is governed by the East River statute (Laws N.Y.1882, c. 410, § 757), which requires vessels to proceed as near as possible to the center of the stream. The Bern, 2 Cir., 74 F.2d 235. Of course, if all three of the vessels had at the same time started to correct their fault and obey the East River statute and proceed as near as possible to the center of the stream, that too would have made for trouble. They had to work out their embarrassment where they were, and the fact that they all were too close to the Brooklyn shore necessarily affected their navigation in respect to each other and was a contributing cause to the ensuing collision between two of them, and so all three should bear the consequences.

■ I have concluded that the position of the Chicago on the Brooklyn side of the river, about 200 feet off the piers, in violation of the East River statute, was a contributing cause to the collision between Sandmaster and the Patchogue. Both the Sandmaster and the Chicago were obliged to navigate in respect to each other. They were approaching each other around the bend made by the East River at the Brooklyn Bridge. A port to port passing was not impossible although the starboard to starboard passing was much easier. The Chicago crossed the signal of the Sandmaster for a port to port passing, insisted on a starboard to starboard passing, blew an alarm and went full speed ahead veering still closer to the Brooklyn shore. Even though the Sandmaster's navigation in respect to the Chicago was faulty, the presence of the Chicago on the Brooklyn side of the river, only 200 feet off the shore, and her own navigation, constituted a contributing cause in placing the Sandmaster in a position where she lost steerage way in the flood tide and collided with the carfloats of the Patchogue. Further, under the circumstances the Patchogue would necessarily be influenced by the Chicago's navigation. The Chicago's position on the Brooklyn side in violation of the East River statute directly affected the navigation of the two vessels that collided. The Chicago "has failed to show that her position had nothing to do with the result, and, hers being a statutory fault, that is enough to cast her". The Luna, The Reichert Boys et al., 2 Cir., 63 F.2d 808, 809. The fact that the Chicago and Sandmaster did not actually collide does not release the Chicago from liability for its part in the subsequent collision between the Sandmaster and the Patchogue.

In respect to the Patchogue—she too was violating the East River statute and was following the Chicago with her port carfloat in line with the Chicago's carfloat, lashed on her port side. Further, the Patchogue did not reverse her engines until after the Sandmaster had just cleared the Chicago. The captain of the Patchogue did not blow a backing whistle until then. It is true that he and his crew testified that the Patchogue's engines had been backing for two or three minutes before that. I do not believe their statements. To believe them, I would have to assume that the Patchogue began backing without blowing any whistle to announce that fact, and according to their testimony the net effect of the engines in re-

verse for two or three minutes was merely to check the Patchogue's headway and go back 150 feet, with the aid of the flood tide. The Patchogue had been proceeding at a speed of two knots over ground against a flood tide of two knots. If the Patchogue went back only 150 feet her engines were not in reverse for two or three minutes; but only for the period between the Patchogue's backing whistle and the collision.

The Patchogue had been heading right on into a scene of danger, evidently intending to continue to follow the course of the Chicago, even after the Chicago and the Sandmaster had crossed signals and alarms had been sounded. The Patchogue saw and heard all this but made no attempt to check her own headway until too late. For these reasons the Patchogue must be charged with her share of the damage. The Cushing, The Proteus, 2 Cir., 292 F. 560; The Bern, 2 Cir., 74 F.2d 235.

I hold all three vessels equally liable for the damage sustained by the libelants in the three suits. A commissioner will be appointed. Submit appropriate decree on notice. This opinion contains the Court's findings of fact and conclusions of law.