### CONSTRUCTION AGGREGATES CO. v. LONG ISLAND R. CO. et al.

No. 399.

Circuit Court of Appeals, Second Circuit.
July 24, 1939.

CLARK, Circuit Judge, dissenting in part.

———◆———

Lynch & Hagen, of New York City (Charles W. Hagen and Henry C. Eidenbach, both of New York City, of counsel), for Denney et al.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (Robert S. Erskine, of New York City, of counsel), for Construction Aggregates Co.

Burlingham, Veeder, Clark & Hupper, of New York City (Chauncey I. Clark and Adrian J. O'Kane, both of New York City, of counsel), for Long Island Railroad Co. and the Patchogue.

Before L. HAND, CHASE, and CLARK, Circuit Judges.

L. HAND, Circuit Judge.

This case comes up from a decree in the admiralty holding liable all three vessels concerned in a collision on the night of

October 5, 1937, in the East River just above the Brooklyn Bridge. The only appellants are the trustees of the Erie Railroad Co., the owners of the tug, "Chicago", but the owners of the other two vessels filed assignments of error, and the case thus became in substance an appeal by all. Two companion suits are to abide the result of this. The facts and the contentions of the several parties, are stated so fully in the opinion of the district judge (The Chicago, D.C., 26 F.Supp. 64) that we will refer to it without restatement. The only essential finding which is disputed, is that the Patchogue did not begin to back in season; and for reasons we shall state later, we agree with that as well as with the rest. We shall therefore address ourselves to the liabilities resulting from the facts as found.

All the vessels were navigating in violation of the "East River Statute" (section 757, Chap. 410, Laws of New York, 1882). But this fault played no part in their liabilities, because the position of each was observed by the others from the moment when their mutual navigation began, and did not hamper any steps necessary for safety. When that is true, we have many times held that their position in the stream is irrelevant, for the collision would have been equally likely, had they all been translated to midstream in the same relative positions. The Clara & The Reliance, 2 Cir., 55 F. 1021; The Wrestler, 2 Cir., 232 F. 448; The Morristown, 2 Cir., 278 F. 714; The Socony No. 19, 2 Cir., 29 F.2d 20; The Syosset, 2 Cir., 71 F.2d 666. We therefore proceed to the other faults charged, and first to the Sandmaster's. In her position relative to the Chicago, only a starboard to starboard passing was lawful, even though, as the judge found, a port to port passing was "not impossible". She was not forced to go to starboard, in which event Inland Rules, Article 27, 33 U.S.C.A. § 212, might have excused a departure from Rule I, Article 18, 33 U.S.C.A. § 203, rule 1. It is only when vessels are approaching "head and head" that they are to pass port to port; "if the courses * * * are so far to starboard * * * as not to be considered * * * head and head" they not only may, but must, pass starboard to starboard. Here the courses passed full one hundred and fifty feet apart, and were by no conceivable standard "head and head". Indeed, the Sandmaster's master did not claim that they were, nor does he seek to

defend his navigation on that theory; he went to starboard because he supposed that he must do so under the Narrow Channel Rule, not being familiar with the Inland Rules. Nor was it of any moment that when the Sandmaster began to manoeuvre, the Chicago showed her red light to her, and she her green to the Chicago. Although prima facie that may have indicated a crossing case, in which the Sandmaster was the giving-way vessel, it was a crossing case only if the Chicago was rounding the Battery and not going down the East River, as in fact she was. When a vessel's course is known, her temporary headings are immaterial. The Victory-Plymothian, 168 U.S. 410, 419, 421, 18 S.Ct. 149, 42 L.Ed. 519; Commonwealth & Dominion Line v. United States, 2 Cir., 20 F. 2d 729, 732; Bull S. S. Co. v. United States, 2 Cir., 34 F.2d 614; The Transfer No. 6, 2 Cir., 45 F.2d 571. These cases do not hold that in a winding channel vessels must always pass port to port, as the Sandmaster argues. They merely make their projected courses—so far as they are ascertainable—the test to their relative duties; instead of their shifting headings before they reach the place where they will meet. Often it will be impossible to project those courses; and then a master is not "called upon to divine the purposes of a meeting vessel, and at his peril to anticipate where she will be in accordance with her undisclosed purposes". The Hallgrim, 2 Cir., 20 F.2d 720, 721. Here, indeed, the Chicago might not have been going down the river; she might have been meaning to round the Battery. Even then, however, the Sandmaster's navigation was wrong, for she was in that case the "giving-way" vessel—Article 23, 33 U.S.C.A. § 208,—and was bound to slacken, stop or reverse, if necessary. It would have been necessary to do so, for the Chicago, as "holding-on" vessel, had to hold her course and speed—Article 21, 33 U.S.C.A. § 206,—and if she had done so, the Sandmaster could not have gone under her stern by a helm movement alone. Moreover, at best the Chicago's course was doubtful, in which event the Sandmaster was bound to blow the "danger-signal". Rule III, Article 18, 33 U.S.C.A. § 203, rule 3. But all this is quite beside the point, for in truth the Sandmaster understood the Chicago's course perfectly well. Her master never suggested on the stand that she might be rounding the Battery, and his violation of Rule I

was due, as we have said, only to his mistaken notion that he should be on the right hand side of the channel.

■■ Furthermore, not only was he wrong in disobeying Rule I, when he tried to turn a safely starboard to starboard passing into a port to port, but he would not have done his duty, even if it had been a "head and head" situation. Rule I also provides that when the positions are "head and head", the signals shall be exchanged "and thereupon such vessels shall pass on the port side of each other". In cases where any change of helm is necessary, this presupposes that the rudder shall not be moved until assent has been secured. This is well-settled, when the proposal is for a starboard passing. Marshall Field & Co. v. United States, 2 Cir., 48 F.2d 763; Chester A. Poling, Inc. v. United States, 2 Cir., 55 F.2d 921; The D. S. Dumper No. 305, 2 Cir., 77 F.2d 315. It applies a fortiori to a port to port passing, because some helm action is always then necessary before the vessels can "pass". The phrase, "and thereupon", indicates that they shall only put themselves in passing position after the exchange. (See the text accompanying the "First" and "Second Situation" of the "Diagrams" of the Local Inspectors). A still farther fault of the Sandmaster was to "cross" the Chicago's signal of two blasts after the Chicago had already "crossed" hers, and to keep on until the Chicago blew a second two blast signal. This we condemned after a full discussion in The Fulton, 2 Cir., 54 F.2d 467, and it was very clearly a fault here, for, as we have said, nothing pressed the Sandmaster to go to starboard; she had the whole river to her left. Being so gravely at fault and in so many respects, we are not disposed to look upon the navigation of the other vessels as strictly as we otherwise should.

■ The judge held the Chicago at fault for being out of position, and did not expressly condemn her for twice "crossing" the Sandmaster's signal. That, together with her navigation following it up, was, however, all that should count against her, and perhaps he meant to include it. In any case she was at fault for so doing, unless she was forced to go off to the left for safety. Article 27. On the whole it seems to us that she is to be excused for that reason. When she got the proposal of the Sandmaster, three courses were open to her: she might try to carry it out; she might go off to port under full speed; she might stop and back. In deciding which she should have tried, we are to consider that her decision once made had to be carried out. Had she gone to starboard, she might of course have escaped, but it would have been in defiance of the rules, since the vessels were safely starboard to starboard. As against that alternative, her actual choice was a reasonable one in the interests of safety, and we should not condemn her, even if we believed it would have been better, which we do not. As for backing, it is quite true that ordinarily in an emergency—although the rules do not positively demand it—that is a vessel's duty. The New York, 175 U.S. 187, 20 S. Ct. 67, 44 L.Ed. 126; The Munaires, 2 Cir., 1 F.2d 13; Bull S. S. Co. v. United States, 2 Cir., 34 F.2d 614; The Quogue, 2 Cir., 47 F.2d 873; The San Simeon, 2 Cir., 63 F. 2d 798; The Bern, 2 Cir., 74 F.2d 235. Nevertheless, safety is always the overriding consideration, and there may be situations in which it is safer to go on. The Chicago had a float on her port hand, and if she had backed, its bow would have been thrown to starboard towards the Sandmaster. Although this would have exposed less of her length to collision, it would have lengthened the time during which she would be crossing the Sandmaster's course, and by shortening the time before the vessels met, if they did meet, have cut down the chance of manoeuvring. The actual choice probably favored safety quoad the Sandmaster; but the important thing was that the Patchogue was coming down behind the Chicago only 500 feet away, and that backing would have stopped her right in the Patchogue's path. The Chicago was faced with an emergency inexcusably thrust upon her, from which she could not free herself in the ordinary way, and we are not disposed to question her decision made under such stress. When all is said, it must be remembered that she did avoid collision, and that, although another collision happened, that was quite beyond ordinary calculation. We hold the Chicago not at fault.

■ We think that the Patchogue was at fault as well as the Sandmaster. This would not have been true, if, having safely passed the Chicago, the Sandmaster had tried to go between her and the Patchogue by a change of course. The Patchogue would not have been called upon to anticipate such a crazy manoeuvre, and none such took place. What happened was that

the Sandmaster, having kept on under her first right rudder even after the Chicago's first answer, when at length she did finally comprehend that she must go to port, used both her rudder and her port engine to help her, and that this very nearly killed her way, leaving her helpless with the Patchogue bearing down upon her. Perhaps, as her master thought, her predicament was aggravated by a difference in the force of the tide upon her bow and upon her quarter, which swung her a little more to starboard; but he was very express that he did not change his helm, or seek to press between the two vessels. Should the Patchogue have anticipated that the Sandmaster might get in front of her? Could she have done anything to prevent collision when the Sandmaster had done so? She had already seen the Sandmaster off Pier 4, and heard her and the Chicago cross signals. She knew that this meant that the Sandmaster was trying to cross the Chicago's bows, and that the Chicago did not agree; and she herself blew two blasts in sign of her own disagreement. After this the natural expectation was either a collision between the Chicago and the Sandmaster, or what actually happened, because the Chicago was clearly going off to port, and did not mean to coöperate in a port to port passing. The Patchogue's master gave as an excuse for not going off to starboard and under the Sandmaster's stern, that he thought she might back, and that if so, she would get across his bows. We are by no means convinced that this was a real danger, but for argument we can accept it; for, if so, he had no excuse for not backing, once the danger developed, and for waiting until the Sandmaster was at such close quarters. He says that in fact he did not wait; that he began to back well before the Sandmaster went under the Chicago's stern; that he had been backing for two minutes before the collision. The testimony of Flynn of the McAllister by no means bears out the last; all he said was that the Patchogue looked as though she was drifting upstream at the collision, which she would have done, if her speed had been anything less than two knots through the water. Moreover, it was abundantly proved that he blew no signal until the Sandmaster and Chicago were passing each other, when he blew the double blast, closely followed by a backing signal. To avoid the obvious consequences of this testimony, he swore that he had begun to back before he blew his backing

signal; but the judge did not believe this, and we do not. We cannot credit it that in an emergency a master should begin to back without blowing a backing signal, should continue to back for a time, should then blow for a starboard to starboard passing, and end up with a backing signal. Since he should have taken decisive action as soon as he saw that the vessels ahead of him were likely to collide, it makes no difference whether the resulting collision was due to a bad lookout, as seems most likely, or to indecision.

Decree modified to exonerate the Chicago;

Damages divided between the Sandmaster and the Patchogue.

CLARK, Circuit Judge (dissenting in part).

The result herein is, I fear, to exonerate the vessel which in some aspects is the most blameworthy of the three involved in the collision. The "Chicago" was navigating downstream near the east shore in violation of the East River statute without excuse save her self-advantage—avoidance of the full tide against her in the center of the stream. And she persisted in this conduct when danger arose; indeed, she put on speed and headed towards the Brooklyn shore. The fact that she saved her own skin should not protect her under the circumstances. As for the "Patchogue," she was following after the "Chicago"—likewise out of position. I am afraid that under this decision not much is left of the East River statute.

This view depends in part on my conclusion that the "Sandmaster" was not so grievously at fault as is stated in the opinion. True, she was also out of the channel, but she had a reasonable excuse. She had previously passed some other harbor traffic and had hauled to the right to do so. She did keep on her course upstream on the right side of the river for approximately 900 feet, which was only for about a minute at the rate she was going. Then she chose to attempt a starboard passage in passing the "Chicago." Some case can be made for her choice; she was not to presume that the "Chicago" would continue an illegal course around the bend of the river. But the court below found against her, and this conclusion is not so unreasonable that I should wish to disturb it. I think the result below was a just one under the circumstances and should not be upset.