## AMERICAN DREDGING CO. v. VACUUM OIL CO. et al.

(District Court, E. D. Pennsylvania. December 24, 1925.)

### No. 110.

**1. Collision ⬳98—Steamer colliding with scow in tow, on meeting on river, held solely at fault in not giving timely notice of approach.**

Under the evidence as to circumstances and conditions, including lifting and settling of fog, large steamer with tug fast to either side, which, shortly after entering the Schuylkill from the Delaware at a point where a dredge was stationed, near mid-channel, with steel cables extending to one bank, collided with scow being towed down the river, *held* solely at fault in failing to give timely notice of approach, and not excused for the failure by taking it for granted that the scow's tug had notice, which, under the evidence, it is also found that it did not have.

**2. Collision ⬳115—Where ship, being navigated by cargo owner's employees, collided through navigator's negligence with scow, owners of ship and cargo held responsible to scow, but, between the two, the cargo owner alone was liable.**

To scow, with which ship, being navigated, with consent of its owners, by employees of cargo owner, collides through negligence of navigator, both owners are liable; but, as between the two, the general employer, the cargo owner, is alone responsible.

In Admiralty. Libel in personam by the American Dredging Company, owner of scow 79, against the Vacuum Oil Company and another. Sur trial hearing on libel, answer, and proofs. Decree for libelant.

Lewis, Adler & Laws, Otto Wolff, Jr., and John F. Lewis, all of Philadelphia, Pa., for libelant.

Howard M. Long, of Philadelphia, Pa., for Atlantic Refining Co.

Biddle, Paul, Dawson & Yocum and H. Alan Dawson, all of Philadelphia, and Barry, Wainwright, Thacher & Symmers and J. C. Prizer, all of New York City, for Vacuum Oil Co.

DICKINSON, District Judge. An outline statement of the controversy is as follows:

(1) Suit is for damage to a scow, due to its being struck by steamer.

(2) Proceeding is in personam.

(3) Steamer belonged to the Vacuum Oil Company, one of the defendants, but was being navigated by employees of Atlantic Company, owner of cargo, the other defendant.

(4) Liability of the Vacuum Company is urged solely on the ground of its ownership of the steamer.

(5) Liability of the Atlantic Company is urged on the ground of its being answerable for the acts of the navigators, whose negligence caused the damage.

(6) This negligence is denied, and a countercharge made of the negligence of the libelant to account for the happening.

The suggested questions are:

(1) Assuming negligence, whether it was the negligence of the owners of the steamer, or of its navigators, or of both.

(2) Whether there was negligence in fact.

The logical and practical choice is to take up the second question first.

1. Let us visualize the locum of the occurrence. The collision took place some little distance within the mouth of the Schuylkill river. This is a stream with what may fairly be called a narrow and tortuous channel. The depth of water is such that large steamers, such as the Paulsboro (the vessel of the respondents), are compelled to keep somewhat close to mid-channel, although there is space and good water sufficient for smaller craft away from this. A working dredge, although not at the time at work, was stationed just east of the mid-channel line about a quarter of a mile below Girard Point. The dredge had lines in the form of steel cables extending to the east or north bank of the river. This narrowed the channel by nearly half of its width. Just what its width was is in dispute, but this is unimportant; the only bearing it has being discussed later.

We can get a clearer view of what happened if we follow first the movements of the Paulsboro. She was bound from the Delaware up the Schuylkill to the Atlantic Refining Company's wharf. The entrance to the Schuylkill is marked by buoys and range lights 27 and 38 feet high. The date of the collision was February 20, 1922. The morning of that day was thick and foggy, so that neither the buoys nor the range towers could be made out. As a consequence she remained at the mouth of the Schuylkill, and, whether intentionally or not, her nose had been run into a mud bank, which held her. Thus far there is no controversy over the facts.

Now comes the story of the steamer. The fog lifted; the steamer was freed from the mud bank, and when the tide had begun to ebb she began her voyage upstream. Her beam was 56 feet, and she was drawing 27 feet of water. Incidentally the Atlantic Company had undertaken to dock her, and met her in the Delaware with two tugs, the master of one of which went upon the bridge of the steamer and assumed charge of her navigation. She was moving upstream under her own power, with the tugs fast to her, one on each side. This added to her beam. The sky was overcast, but there was a view as far up the river as Girard Point. This gave those on the bridge of the steamer a sight of the dredge. As she approached the dredge, she gave the usual signal for passing a working dredge. Whether the dredge was warped over further to eastward is not stated very definitely, and is in itself of little consequence. The beam of the steamer, with her two tugs, and the water she was drawing, suggested that it was good navigating judgment to pass the dredge as near on the starboard hand as was safe. The tug Pilot, of the libelant, with a scow on her port side, was made out somewhere above the dredge and about dead ahead of the steamer, which held her course. The usual port to port passing signal of one whistle was given, which the tug answered, but followed it immediately with the signal of danger. The tug neverthless attempted to obey the passing signal given, by going to her starboard hand, and almost succeeded in getting far enough, so that the vessels could pass port to port, when the steamer collided with the scow, doing the damage for which the libel is filed.

The failure to sound the passing whistle sooner is explained by the circumstance that the tug gave no signal, and that, as it was the practice in the Schuylkill for the smaller craft to give way to the larger, so that the latter might have the deeper water, the steamer expected the tug would go to the west or south side of the channel, and supposed the tug had given no signal because there was no danger of collision, in view of her own intention to keep out of the way of the steamer. The failure to slow down is excused by the statement that the speed was slow, and to have shut down her engines would have been to have taken the steamer into the dredge, which she had just passed or was then passing close aboard. The not sounding of fog whistles is justified by the fact that there was no fog. No fog whistles were heard from the tug, nor did the dredge strike any bell.

The argument pressed upon us is that the steamer was in no fault, or, if the failure to sooner exchange passing signals is found to be a contributing cause of the damage done, that both the steamer and the tug shared in this. The story of the tug raises,

as is not unusual in maritime cases, a sharp dispute over many of the facts, and especially over that of fog or no fog. Her story is that the errand on which she was going was to take the scow down the Schuylkill. The scow was in a slip at Girard Point. There was a "thick, low-lying fog" on the river, which detained the tug until 10 o'clock. The fog then lifted, so that the promise of clear weather prompted her to make a start. It took a little time to get the scow out of the slip, but when this was done the tug started down the river, intending to pass the dredge to port, because of the cables before mentioned. She reached the neighborhood of the dredge about 10:30, this being the time of the collision. In the meantime the fog had settled down again, and she sounded fog whistles and slowed down. Suddenly, and to her unexpectedly, the steamer loomed up out of the fog a short distance below the dredge and within striking distance of the tug, and at once gave the port passing signal. There being nothing else to do, the tug answered it, but immediately followed with danger whistles, and attempted to get out of the way of the steamer by going to the westward. Having no headway on and being incumbered with the scow, she failed in this, because the steamer came on without slackening speed and struck the scow.

The mind does not rest with entire satisfaction upon any view of the merits of this case which suggests itself, and refuge must be sought in rather broad generalizations. The learned proctors for the libelant attach all importance to the fact finding of a fog at the time of collision, because they deem this to be the controlling fact feature of the case, as indeed it well may be. Upon this point the witnesses are in flat contradiction. Assuming to be meant a fog so thick that navigation would be dangerous, the known facts are against its existence. It is to be supposed that neither navigator would have risked his vessel in such a fog, because they earlier had both tied up on account of the fog. Again, we are bound to believe that the fog lifted, because each navigator had testified that he moved his vessel because the fog had lifted. If negligence is imputed to either, because the fog had not so far lifted as to warrant the start on the voyage, the like blame attaches to both. The only fog finding which can be made, with which the known undisputed facts are not in conflict (and a part of such finding would be in dispute), is that there was a fog so dense as that it would have

been negligence to have navigated in it without necessity to so do; that this fog lifted about 10 o'clock, so as to justify moving; that it settled down again within less than half an hour, so as to call for fog signals (this being the part in dispute); that at the time of the collision it was thick enough to conceal approaching vessels until they came within striking distance of each other, and that it again lifted after the collision.

This is in effect the finding which the libelant asks us to make. The finding is of importance because, if the fog does not enter into the finding of negligence, then the only negligence imputable to the steamer is that of delay in giving the passing signal, and if the approach of the steamer was known, or should have been known, on board the tug, the most favorable finding to the latter which can be made is half damages. The real importance of the fog finding thus resides in the excuse which it affords the tug for not discovering the approach of the steamer in time to make a port passing in safety. Whether justified or not, there is an inference, born of our knowledge of human nature, that the lighter vehicle will exercise more care to avoid collision with a heavier than will the heavier with a lighter. There are so many exceptions, however, to this rule (if it be a rule), that we do not give the operator of the lighter the benefit of it, unless by his conduct he convinces us that he is not one of the many exceptions. The light vehicle which goes at a reckless rate of speed when danger is present is one of the exceptions. Here (and this has another significance to be noted later) the tug is even charged with loitering. We always look for that to be done which it is natural to do. Why would this tug wait to be run down by a big steamer, if it knew the danger?

Again, the undisputed fact is that the tug had slowed down. Why would the tug have slowed down, unless because the going was dangerous by reason of the fog? The denying statements of the steamer nevertheless remain, and the truthfulness of the witnesses for the respondents cannot be lightly questioned. The same may be said for the witnesses of the libelant. Is there any way of reconciling the conflicting testimony? Counsel for libelant (among other things) suggested that the temperature of the sewage which flows into the Schuylkill being higher than that of its waters would raise a mist, which might account for the conflict of testimony. This has been criticized by counsel for respondents as fantastical, and,

so far as this special feature of the suggestion goes, the criticism is doubtless justified. Any one familiar with fogs on water, however, knows that they do play the most fantastic tricks with both sight and hearing. They will cause one to see things which are not there to be seen, and will hide things which are near at hand from sight, and will act sometimes as a muffler of sound, and sometimes magnify it as a sounding board.

There is a difference likewise between fog and no fog, according (as counsel pointed out) to whether you are near the water level or above it, and you need not go far aloft to note the difference. Another fact, however, is that the direction in which you are looking will often make a great difference. Witnesses for the respondents were looking upstream and over the land, where the fog would be lighter, and were well above the water. The witnesses for the libelant were looking downstream and over the Delaware river, where the fog would be heavier and thicker. It might thus well be that the witnesses looking upstream could see for a long distance a vessel coming down, and the view of those on the vessel coming down be much shortened of the vessel going up. The direction of the wind will often make a like difference in the view. A finding in a case of this kind is influenced by the weight of so many circumstances (each in itself of little importance) that they cannot all be enumerated.

[1] The conclusion reached is that the tug had no notice of the approach of the steamer in time to get out of her way, and was guilty of no negligence which contributed to the collision, and that the steamer was guilty of negligence which caused the damage, in that she failed to give timely notice of her approach, and that she is not excused for the failure to give notice by taking it for granted that the tug had notice. The libelant may recover for damages, with costs.

[2] 2. The only remaining question is that of the responsibility of the two respondents. We may state without elaboration our conclusions on this second question in two propositions:

(1) As respects third parties, the owners of a ship are responsible on the respondeat superior principle for the negligence of a navigator, who with their consent is in charge of the ship, notwithstanding that the navigator is at the time in the general employ of another.

(2) As respects two employers, however, each employer is responsible for the negligent acts of his employees in the general scope of their employment.

Applied to this case, this means that the libelant may recover against both respondents, but as between the respondents the Atlantic Refining Company is alone responsible. We say this because we understand counsel to be in agreement that the common-law rule that neither of two tort-feasors can recover against the other is not to be applied. The reported cases are in accord with these propositions. Wilmington v. Franco, 259 F. 166, 170 C. C. A. 234; The Dorset, 260 F. 32, 171 C. C. A. 68; The John D. Rockefeller (C. C. A.) 272 F. 67; The Ascutney (C. C. A.) 277 F. 243; The Edward G. Murray (C. C. A.) 278 F. 898.

A final decree in conformity with this opinion may be submitted.