454

## THE S. S. DEUTSCHLAND.
## THE S. S. MUNARGO.
### Nos. 356–359.

Circuit Court of Appeals, Second Circuit.
June 7, 1937.

Morgan & Lockwood, of New York City (Mark W. Maclay, of New York City, of counsel), for appellants Farley and Fearey as trustees, Munargo S. S. Corporation, and George Clark.

Carter, Ledyard & Milburn, of New York City (Rush Taggart, of New York City, of counsel), for libelant-appellant American Molasses Co. of New York.

Haight, Griffin, Deming & Gardner, of New York City (John W. Griffin and Arnold W. Knauth, both of New York City, of counsel), for the Deutschland and appellee.

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

MANTON, Circuit Judge.

The steamship Deutschland and the steamship Munargo collided, on November 17, 1933, in New York Harbor near the Statue of Liberty. The three libels and a cross-libel here considered were filed for damages due to this collision—to each vessel, to cargo, and to loss of personal effects by the chief steward of the steamship Munargo. The Munargo Steamship Corporation is in reorganization proceedings under section 77B of the Bankruptcy Act, 11 U.S. C.A. § 207. Decrees were entered below dismissing all but the cross-libel filed by the owners of the steamship Deutschland and it was granted an interlocutory decree.

The Munargo, a passenger and cargo ship, 413.8 feet long and 57.8 feet wide and 6,484 gross tons, arrived from West Indian ports on November 17, 1933, and, after discharging her passengers and part of her cargo at Pier 64 North River, left that pier at 5:15 p. m. to complete discharge at Erie Basin. She proceeded by way of the main·channel south to Governor's Island. The Deutschland, a transatlantic vessel, 627 feet long, 78.10 feet wide, and of 20,680 gross tons, arrived from Hamburg, Germany, with passengers, and was coming up the harbor bound for her berth at Pier 86 North River. They collided while passing, at 5:42 p. m., at a point 600 feet east from Green Flashing buoy 31, located at the north end of the Liberty Anchorage. The tide was flood and about at its maximum strength, with a velocity of 1½ knots per hour; wind was S. W. about 20 to 30 miles an hour; atmosphere clear and good visibility, although it was darkening. The angle of the collision was about 60° when the Deutschland struck the Munargo on the latter's port side slightly forward of amidships, penetrating into her about 5 feet in the bottom plates and about 12 feet on the upper deck.

When the vessels were navigating toward each other, the Deutschland was proceeding on the westerly side of mid-channel, though it was safe and practicable for her

to have kept on the easterly side of the center of the channel. Another vessel, the Shawnee, somewhat ahead of the Deutschland, pursuing a course similar to and slightly east of the Deutschland, had the Munargo always on her port bow and passed her safely port to port.

The question presented to us is whether the relative position of the vessels as they approached was such as to require the port to port or starboard to starboard passing. The Deutschland contended it should have been starboard to starboard. Sixty-five witnesses, members of the crew and independent, were called and gave various versions as to the navigation of the vessels.

The testimony of the Deutschland's witnesses was accepted below and placed her coming up on the westerly side of the channel when she saw the Munargo on' the easterly side of the river with an easterly heading. The Munargo straightened down to pass the Shawnee, and during this time the Deutschland and the Munargo were green to green in positions which required passing starboard to starboard. After passing the Shawnee, the Munargo made a rapid swing to her own starboard in a belated attempt to cross over from the eastward to the westward side of the channel; she continued this swing two or three minutes until she collided. The Deutschland reversed and dropped her anchor as soon as the Munargo's swing began and about killed her headway before the vessels came together. Many of the witnesses for the Munargo tended to support the claim that the vessels were approaching so that they could pass port to port and that the Deutschland swung suddenly to the westward off her course and ran into the Munargo as she tried to get by. The place of collision is not in dispute.

After anchoring at Quarantine, the Deutschland proceeded first in mid-channel and then over to the westerly side of mid-channel. She crossed to the westerly side, her navigators said, to get deeper water and avoid the set of the flood tide over toward the East River and to avoid the traffic passing in and out both north and south of Governor's Island. This she did on approaching the upper part of the channel, changing to westward gradually in order to head up the North River. Her course up the channel was at first 27° by gyrocompass or 26° true. The Shawnee, going faster than the Deutschland, passed on the starboard side. As she passed, the Deutschland altered to port to give wider clearance and then proceeded up the west side of mid-channel again 26° true. Before reaching the Statue of Liberty, she began to change gradually to port, as was the custom of vessels of this size. She thus altered from 26° true. She was 20° or 21° when she first signalled to the Munargo. Two minutes before the collision, the Deutschland reversed her engines; the effect of the tide and wind upon her hull and the pull of her anchor caused her to swing more to port to her collision heading—10° true. The force of the blow from the Munargo bent her stem over to port and swung her considerably to port.

From anchorage to point of collision was 9,300 yards. After turning around at anchorage and covering about 1,200 feet of the distance, the Deutschland went full speed ahead; this was about 21 minutes before the collision. The engine orders are recorded in the maneuver book—she ran 4 minutes full speed—2 minutes at half speed—4 minutes at full speed—6 minutes at half—3 at slow and for 2 minutes the engines were reversed. Her full speed was 19 knots. As the engines were reversed, the anchor was dropped and when 30 fathoms of chain had run out on the anchor, the brake was applied, stopping the run of the chain.

The master of the Shawnee testified that she was fairly close to the east side of the channel and passed 1,800 feet from the green buoy. The Munargo was well east of the channel, and when near Pier 1 swung over toward Governor's Island, then back to the westward. Admittedly she was heading in a southerly or southeasterly direction toward Governor's Island. She straightened down the bay to pass the Shawnee. The Munargo and Shawnee exchanged whistles—an officer of the Shawnee saw the Munargo showing her green light and the Shawnee's captain at first ordered a starboard helm in order to pass the Munargo starboard to starboard, but this was canceled. The evidence justifies the finding that the Munargo was headed over to the eastward and that she was swung to a heading down the channel for the purpose of passing the Shawnee, and as the Munargo cleared she swung across the channel to the west across the Deutschland's bow. The Shawnee and Munargo passed each other 2½ minutes before the collision. At that time the Deutschland bore about 3 points on the Shawnee's port quarter. The Munargo was headed down the channel showing her

green to the Deutschland's green. Each was about a point on the other's starboard bow, and a starboard to starboard passing was required and could have been made safely but for the navigation of the Munargo. The Munargo did not merely straighten down the channel as claimed; nor did the Deutschland change her course. The Munargo, to go over to the west side of the channel in order to pass port to port, swung directly across. When the Munargo passed the Shawnee, she was already heading down the channel. If she had then straightened to an exact channel course, and so continued, she could have passed 500 feet east of the Deutschland on the easterly side of the channel. The bend, if any, at this place, played no part in the collision and the argument that it did is without merit. After swinging somewhat to starboard to clear the Shawnee, the Munargo swung rapidly to starboard. The Munargo's engines were put full ahead and her helm hard-aport and her engines continued so until collision; her helm remained hard-aport until just before the impact when it was shifted to hard astarboard. She was full ahead about 2½ minutes, going about 9 knots and covered about 2,250 feet, a good part of the half mile separating the vessels. The Deutschland reversed when she was 700 yards away making the swing, and she blew three whistles' and dropped her anchor. The Munargo continued swinging until collision.

■ The Deutschland blew 2 whistles three times and 3 whistles when she reversed on seeing the Munargo begin to swing. The whistles were heard by navigators on other nearby vessels. The wind was blowing from the Deutschland to the Munargo. In addition, the Deutschland's funnels were illuminated by floodlights which shone on the whistle. The first two signals were blown before the Munargo had passed the Shawnee and the third as they were passing. The Munargo admits hearing the third signal after clearing the Shawnee and the signal of three. She knew of the danger after the cross whistle and should have stopped or reversed. The Quogue (C.C.A.) 47 F.(2d) 873. If she had reversed this distance away, the collision would have been avoided. The Munargo, the court found, blew to the

Shawnee and then, when a half a mile apart, a second whistle. When the third was blown, the Deutschland had already reversed.

■ The appellant argues that the Deutschland was on the wrong side of the channel as she was proceeding and therefore violated article 25 of the Inland Rules (33 U.S. C.A. § 210). It provides: "In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel."

But this violation would not have been followed by a collision if the Munargo had pursued the course which the situation required. In The Bellhaven, 72 F.(2d) 206, 207, where we held that the burden was upon the tug on the wrong side of the narrow channel to excuse herself for so navigating, we said: "We have often held that if the offending vessel is visible by the other in time to shape her movements accordingly, and if she does not impede the other's navigation by her unlawful position, her fault has not contributed."

The Deutschland's signals announced her intentions in navigating at a time when both vessels were approaching green to green. In The Californie, 250 F. 790, 792, we observed: "When a quarter mile apart the boats were on substantially opposite parallel courses, warranting a starboard to starboard passage, which the McAllister claimed, and the steamer did not accord. Therefore the latter is solely at fault." See, also, The District of Columbia (The Yomachichi), 74 F.(2d) 977, 103 A.L.R. 768 (C.C.A. 4), certiorari denied Norfolk & Washington Steamboat Co. v. U. S., 295 U.S. 745, 55 S. Ct. 657, 79 L.Ed. 1691; The Delaware, 66 F.(2d) 467 (C.C.A.2).

The mutual duties of these vessels are to be determined by their respective positions which required a starboard to starboard passing. The Munargo was solely at fault.

We find nothing in the many authorities cited by the appellants which justifies placing liability on the Deutschland.

Decrees affirmed.