**NATIONAL MOTORSHIP CORPORATION**
**v. PENNSYLVANIA R. CO.**
**No. 172, Docket 20475.**

Circuit Court of Appeals, Second Circuit.
Feb. 26, 1947.

Chauncey I. Clark and Burlingham, Veeder, Clark & Hupper, all of New York City (Frederic Conger, of New York City, of counsel), for tug Chester, The Pennsylvania Railroad Company, claimant-appellant.

Frank C. Mason and Mahar & Mason, all of New York City, for appellee.

Before L. HAND, AUGUSTUS N. HAND and FRANK, Circuit Judges.

L. HAND, Circuit Judge.

The Pennsylvania Railroad Company appeals from an interlocutory decree in the admiralty, holding it solely liable for a collision in New York Harbor off the Battery upon a clear afternoon on Christmas Day, 1944. The railroad's tug, "Chester," was rounding the Battery, bound up the East River with a railroad float on her port hand; the collision was between the starboard corner of the float and the starboard bow of the motor vessel, "Clevelander," which was coming down the East River, also rounding the Battery, and bound for Edgewater, New Jersey. The testimony was, as is usual in such cases, completely at odds, and it would be impossible for us to reach any certain conclusion from the printed record; thus it is especially proper to treat as final the findings of the judge who saw all the witnesses. The most im-

portant of these are that the collision took place about 100 feet off the Ellis Island ferry rack; that the vessels first sighted each other when they were 1000 feet apart; that the "Clevelander" was on a course about 100 feet off the pier ends; and that the "Chester" was on a course between 200 and 300 feet off the pier ends. Upon these findings, as the judge said, clearly the vessels "were in a position to pass safely port to port." The "Clevelander" did not blow a passing signal to the "Chester," when she first saw her emerge from behind the ends of the sheds on the piers, or at any time; she waited without doing anything until the "Chester" volunteered a two blast signal. The reason for this inaction was that her master interpreted the situation as a crossing case, because the "Chester" bore on his starboard bow, and he supposed it to be his duty to keep his course and speed. Before the Inspectors, four days after the collision, when asked to explain why he accepted the "Chester's" two blasts, he answered: "because I didn't have room enough to give him a danger signal and hold my course and speed which the rules of the road told me to do. I had the right of way. I had him on my port hand. The rule says that the vessel which has the other on her own port shall hold her course and speed." Again: "the law tells me to hold my course and speed." Again: "at the time I saw that tug and float, there was no need to blow my whistle. He was so far off from me and going across my bow that there was no need to do anything other than to keep my course." It is true that at the trial he changed this account of the collision, and said that the situation appeared to him to be a port to port passing as soon as he saw the "Chester"; but this we cannot accept in the absence of a finding in his favor. After an interval which the "Clevelander's" master described as "maybe half a minute" the "Chester" blew the double blast to which we have just alluded, and which she accompanied by a left rudder. How far apart the vessels then were we can only guess; their mutual approach was about five miles an hour, and, if they had been moving for "half a minute" before the "Chester" turned, the distance must have been from 700 to 800 feet. The "Clevelander" immediately answered the "Chester" with a two blast signal and put her own rudder hard left. The "Chester" soon thereafter, apparently perceived that she could not carry out her proposal, blew the danger signal, and backed; this swung her float to starboard and brought its starboard corner into contact with the "Clevelander's" starboard bow.

■ The navigation of the "Chester" was inexcusable, but we cannot escape the conclusion that the "Clevelander" was also at fault. Although the actual courses on which each vessel was bound were safely port to port, they were only 100 or at most 200 feet apart, and were therefore within the rule,[1] for that was close enough "to involve risk of collision." Perhaps each could not so certainly forecast the other's course as though they had both been threading a winding channel; nevertheless the "Clevelander," knew her own course and that it would take her, if not obstructed, around the Battery at about the distance off shore that she then was; and to her the "Chester" must have appeared either to be rounding the Battery, like herself, or going off across the river. We can at once eliminate the second alternative, because she was towing a loaded car float. Thus it was the "Clevelander's" duty to announce a port to port passing by blowing a single blast, just as it was the "Chester's" duty.[2] That duty was immediate, for obviously the time for mutual understanding arose as soon as the "Chester" appeared; in such close quarters a signal delayed is an invitation to disaster.[3] We are not faced with the decision of a master made upon the spot, which was within the range of proper nautical decision; for, as has appeared, the master of the "Clevelander" did not delay his signal because he thought it safe to do so, but because he misunderstood his duties; apparently he was not aware that when approaching vessels are

[1] § 203, Title 33 U.S.C.A.

[2] The America, 92 U.S. 432, 23 L.Ed. 724; Chester A. Poling Inc. v. United States, 2 Cir., 55 F.2d 921.

[3] The John I. Brady, 5 Cir., 131 F. 235; The Richmond, D.C.S.D.N.Y., 124 F. 993; American Dredging Co. v. Vacuum Oil Co., D.C.E.D.Pa., 11 F.2d 884.

512

on curving parallel courses their headings do not determine their duties.[4]

This failure was a statutory fault, and the only question is whether it had anything to do with the collision; or, more properly, whether the "Clevelander" has shown beyond peradventure that it could not have had.[5] The statement of that question is almost its answer. Even a master as negligent as the "Chester's" would scarcely have initiated a starboard passing in the face of a single blast. If he had thought the "Clevelander's" proposal incapable of compliance, he might have sounded · an alarm and backed, and at that time this would have thrown the float away from danger. Moreover, the vessels were then so far apart that by mutual backing they would either have killed all mutual approach, or have killed most of their momentum. On the other hand, the "Chester" might have responded with a single blast, have put her rudder right and gone clear.

■ Besides, it can be demonstrated that it was a gross fault for the "Clevelander" to · accept the "Chester's" proposal for a starboard passing, for the vessels could not possibly have cleared each other even if the · distance between their courses had been 100 instead of 200 feet, as the judge thought more probable. The "Clevelander" was 250 feet long, and upon her turning circle her stern would not have left the course she was on, even under a hard over helm, for 600 feet; her bow would indeed have gone off to port 150 feet but that would have put her either athwart the "Chester's" course, or she would not even have reached it. Meanwhile the "Chester" would have been turning to meet her, and would scarcely have left her own course, laden as she was, within the same distance. With vessels not more than 700 or 800 feet apart the proposal for a starboard to starboard passing was patently crazy; and its acceptance went beyond the limit we can accord to a decision even in extremis. We cannot close better than by quoting the language of a great admiralty judge: "The lesson that steam vessels must stop their engines in the presence of danger, or even of anticipated danger, is a hard one to learn, but the failure to do so has been the cause of the condemnation of so many vessels that it would seem that these repeated admonitions must ultimately have some effect."[6]

Decision reversed; damages divided.

---

[4] The Victory and the Plymothian, 168 U.S. 410, 18 S.Ct. 149, 42 L.Ed. 519; Construction Aggregates Co. v. Long Island R., 2 Cir., 105 F.2d 1009.

[5] The Pennsylvania, 19 Wall. 125, 22 L.Ed. 148.

[6] The New York, 175 U.S. 187, 207.