**IRA S. BUSHEY & SONS, Inc. v. THE J. H. TUTTLE et al.**

**RED STAR BARGE LINE, Inc. v. THE J. H. TUTTLE et al.**

**THE ROSEBUSH.**

**THE FLUSHING.**

**THE SEABOARD NO. 35 et al.**

Nos. 18579, 18566.
United States District Court
E. D. New York.

July 9, 1951.

Foley & Martin, New York City, proctors for libellants (Edward J. Ryan, New York City, of counsel).

Lyeth & Voorhees, New York City, proctors for claimant Standard Oil Co. of California (Mark W. Maclay and Walter S. Avery, New York City, of counsel).

Macklin, Speer, Hanan & McKernan, New York City, proctors for Red Star Towing & Transp. Co. (Leo Hanan and Charles J. Carroll, New York City, of counsel).

BYERS, District Judge.

These causes, tried together, involve one state of facts, but will yield separate decrees; they arise from the collision between the claimant's S. S. J. H. Tuttle and the scow Rosebush, in the second tier, port side, of a three tier ·tow of the tug Flushing, which was proceeding northerly in the Arthur Kill, on April 1, 1947.

The place is agreed to have· been generally between Buoy 4 marking the channel's easterly line, and the Barber Asphalt Plant dock on the New Jersey side.

The Tuttle had passed this tow (Tuttle Ex. 1) off the Perth Amboy ferry (circled in red, id.) to port; that is, the tow was on the New Jersey side, having left South Amboy bound for New York harbor. The weather ·was clear and did not affect the navigation of either the ship or the tow. The tide was flood, i. e., under foot as to both, and was of a strength of about 2 knots. There was no other navigation to be reckoned with and the sole question of fact is clearly presented, namely: When The Tuttle was turning to port to effect a landing at the Barber plant, and the tow was passing astern, pursuant to the ship's signal of one blast, did the ship back into The Rosebush, or was the tow strung out diagonally in the channel so that as it

moved ahead The Rosebush was necessarily brought into collision with the ship's stern while the latter was still in the water, or in the act of turning toward the New Jersey shore?

The physical conditions require statement:

The ship is a steel tanker, 547' by 70', and ·being laden, was drawing 30' 6". Her tonnage is 11,658.

The 35-foot channel is 400 feet wide, and the chart shows a depth of 30 feet at its westerly side, which increases to 37 feet off the Barber plant, some 450 feet or so· west of that channel line. Toward the Staten Island side there is a depth of 20 feet immediately east of the channel on that side. Thus it will be seen that to turn the 547-foot ship in a semicircle having a diameter of nearly 900 feet and so as to bring her alongside the Barber dock, in a flood tide, did not require a miracle of navigation, ·but rather care and circumspection. To aid in the movement there were two Dalzell tugs in position on the ship's starboard side, but the evidence as to how and just when they functioned is negligible.

The Flushing is 83 feet on the line, 90 feet overall by 22.5 feet ·by 8.4 feet, with horse power 750.

Her tow consisted of five laden ·wooden coal scows in two files, three to port, two to starboard; the first two tiers therefore had two scows abreast, and the third but one, which was tailing the second on the portside. These craft were of an average length of 116 feet, average beam of 36 feet and average depth of sides of 9 feet. The gross tonnage was 325 minimum, 379 maximum, which means that they were all of about the same size; the make-up of the tow is not criticized.

Towing hawsers, 125 feet long, ran from the tug to the outside corners of the head scows. Roughly, the tow measured about 560 feet from the bow of The Flushing to the stern of the last scow, and the greatest width was about 75 feet.

The Rosebush, owned ·by libellant in the first cause was in the second tier, to port and, as above stated, was in ·collision with

the tanker. Just ahead was the port hawser scow Seaboard No. 60, and astern The Seaboard No. 35. The starboard hawser scow was The Seaboard No. 47; the second cause is based upon damage to these three, said to have resulted from the Rosebush collision, libellant Red Star Barge Line, Inc., being the owner of those vessels.

The Tuttle entered the 35-foot channel from the east at about the time the tow was proceeding out of South Amboy in the 20-foot channel; those converge about off the ferry slip which has been mentioned; the ship blew a one-blast signal to pass ahead to starboard, to which the tug assented, and in that order both proceeded up the Kill, the ship making about 6 knots and the tow about 4. The ship was about in mid-channel, and the tow favored the New Jersey side until it rounded Ploughshare Point on the latter, where it tended to swing wide, and then straightened away for the next reach of the Kill, in about mid-stream. When the tug itself was about under the Outerbridge and the ship was about half a mile ahead, the latter, by way of initiating the maneuvers necessary to complete the half circle to port and come alongside the Barber dock (which extends along the Kill) on the New Jersey side, blew one blast to signify to the tug that "I didn't want her to go down (sic) inside of me, in other words, towards the Jersey shore from me. And then I blew three blasts to signify my engines were going astern."

At this juncture The Tuttle was about half-way between the Outerbridge and the Barber plant. Her signal indicated her destination and maneuver, which was understood on the tug, and the latter blew a one-blast acknowledgment. The Mate, Mc-Vay, was navigating the tug, and his statement that he thus became aware for the first time of the ship's purpose was convincing, and is accepted.

From that time forward, the tug and the ship were acting under an agreement, although the latter did not hear the answering blast from the former. The ship repeated both signals after a short interval, and the tug's answer of one blast was heard,

so that the mutual purpose was clearly understood when the tug was not more than a quarter of a mile above the Outerbridge, and The Tuttle was about that distance ahead of the tow, and probably a little more. When The Tuttle was one-half or two-thirds of the distance between the Outerbridge and the Barber plant, the tow was estimated to be then not less than 1,500 feet astern.

The ship's pilot looked astern and observed that the tug at once "altered his course to his own starboard * * * maybe right underneath it (Outerbridge)". The tug was then in "a straight course in the channel."

In resolving the narrow question which has been indicated, it may be helpful to state the issues presented by the pleadings. Since they are substantially the same in both causes, it will be understood that references stated in the singular should read in the plural.

The libel is against The Tuttle and in effect alleges that she "backed down and into the tow". The answer denies this and asserts that, after the exchange of signals above recited, The Tuttle started to swing to port, assisted by the tugs, and that "The Flushing continued on hooked-up and passed clear of the stern of the Tuttle and then stopped her engines whereupon the tow was swung around on the flood tide and one of the scows in the tow, the Rosebush, fetched up under the Tuttle's counter and came in contact with the latter's stern * * * At no time did the Tuttle back up or gain any sternway prior to the collision."

An impleading petition under the 56th Admiralty Rule, 28 U.S.C.A., was filed with the answer, directed to The Flushing and to the Red Star Towing and Transportation Company, as owner, which contains substantially the quoted allegations. The important specifications of fault are that the tug:

3. Failed to keep clear in overtaking The Tuttle.

4. Failed to reach an agreement with the overtaken vessel before proceeding to pass The Tuttle.

This is contradicted by The Tuttle's evidence and is now disregarded.

5. Failed to keep on her own starboard side of the channel according to Article 25 of the Inland Rules, 33 U.S.C.A. § 210.

6. Failed to navigate in accordance with the exchange of one-blast signals. (Seemingly this exchange was denied in Specification 4.)

7. Failed to continue on her course to starboard after exchange of signals.

8. Failed to slow, stop, or stop and reverse her engines when in danger of collision.

It will be seen later that The Flushing is blamed for doing the very thing that this specification charges her with failing to do.

9. Failed to take proper precautions to avoid collision when danger thereof was apparent.

Evidence in support of this is not cited in The Tuttle's brief.

10. She failed to take into consideration the effect of the wind and tide on her tow.

There was no wind, and the rest is argumentative, at best.

11. She failed to continue on her course after passing clear of the stern of The Tuttle and permitted her tow to swing into The Tuttle.

She did stop her engines after passing the ship, but in the belief that the force of the imminent collision would be thus mitigated.

These are the matters concerning which The Tuttle undertook the burden of proof, and it is requisite to ascertain the extent to which she may be deemed to have succeeded.

As to the navigation of the tow, following the exchange of signals, a conclusion is assisted by evidence from both camps.

The distance from the Outerbridge to Buoy 4 is about 1,200 yards, and within that distance the tug veered to her starboard at the exchange of the first one-blast signal, understanding that the agreement required that she should so navigate her tow as to leave the westerly half of the channel, 200 feet, open to The Tuttle for making the necessary port turn, and perhaps some of the easterly half also, depending on the ship's apparent handling.

The testimony of McVay, the tug's mate and navigator, is accepted as to his slowing down his engines to half-speed in accord with The Tuttle's first signals when the tug was about under the Outerbridge; and that the tug had proceeded about a quarter of a mile at the next exchange; that between those two signals the tug headed for the east side of the channel and reached a position which enabled McVay to "line up buoys 4 and 6 and to keep them practically in range at all times".

This maneuver can be stated in distance but not time, for it is impossible to know how soon the reduction in engine speed became effective, in the flood tide; nor can it be said how soon the change in the tug's helm accomplished the intended purpose of lining up the tow astern and close to the easterly edge of the channel. Her own witnesses, which include the bargee of The Rosebush, put the tow in those waters, parallel to the channel, just prior to the collision, and they are aided by Captain Hill of The Tuttle, who was on the bridge observing closely, and Second Mate Harriss who was on the stern preparing to supervise tying up the ship when she should dock. The first placed the tug and tow about parallel to the channel, just prior to the collision; and the second said that "It had hauled to the right, but I don't remember if they were continuing to the right. They hauled over to the right side of the channel".

Since the tow proceeded about 2,000 feet from the point where the tug headed so as to range the buoys as stated, to the waters off buoy 4, and since the inclination was from about mid-channel, it seems that to bring the tow almost straight astern when nearing the latter buoy involved lateral movement of say 125 feet (the tow was 75 feet wide). I have no difficulty in finding that the tow was in a position to pass clear of The Tuttle's stern and near the easterly edge of the channel if 100 feet of open water had been avail-

able to her; probably the tow was not parallel to the center of the channel for the entire length of the flotilla, but such tailing to the west as may have been present was not so pronounced as to mean that the tow was swept against The Tuttle's stern, even after the tug's engines were stopped, as I visualize the situation. The same tide that carried the tow along also affected The Tuttle as she lay angling across the channel, not less than 45° according to her own pilot, and more than that according to her Captain.

The impression made upon this Court by the depositions of the ship's officers, rather than the testimony of her pilot taken in court, is that the former seek to visit blame for the collision upon The Flushing because of the handling of the tow when the tug itself had passed beyond and parallel to the ship's stern, and then stopped her engines; it seemed wise to those witnesses to suggest that the tow was then caused to sag to her own port, and against the stern of the ship, through the loosening of the starboard towing hawser, to which Harriss testified: "Then the man on the towboat slacked away on the starboard towing line of the barges. The flood tide took charge of the barges and pushed the center barge (Rosebush) of the port string against the Tuttle's stern."

This testimony is discreetly ignored in The Tuttle's brief; I am satisfied that nothing of the kind took place, and so find.

What did happen will appear later. This testimony is cited to show an apparent divergence between the argument now made for The Tuttle, and the mental attitude of her officers when testifying, both efforts being directed of course to the same end.

If The Flushing had indeed come too close to The Tuttle, being on a diagonal course across the channel as the latter's proctors now argue, I should suppose the eyewitnesses would have deposed something to that effect.

The allegations in The Tuttle's answer and impleading petition are consistent with what her Captain and Second Mate had told her investigators, but in the important detail of that starboard towing hawser, the proof is plainly to the contrary

What happened was that the blow delivered against The Rosebush was strong enough to cause her to be thrust laterally with sufficient force to cause the starboard bow hawser which was holding The Seaboard No. 35 to the stern of The Rosebush, to carry away. That caused the tail of the tow to buckle, and the stern of The No. 35 to swing around alongside, but not in contact with The Tuttle. Harriss, in the excitement of the moment, made a mistaken observation and confused the hawser which was thus parted, with the towing hawser, although the latter may not have been within his ken.

The impact upon The Rosebush was sufficient to break her port top log, and the third side plank; 19 deck planks were broken, and other timbers as listed in the survey. If The Rosebush had delivered the blow, its force would have been expended upon The Tuttle, but the latter sustained no damage. Perhaps no inference is supportable as to the source of the energy thus engendered, but the circumstance is at least compatible with the deliverance of the blow by the ship rather than the scow. If this imputes sternway to the ship, which of course it does, it becomes necessary to determine whether her evidence is consistent with such an inference.

As to her maneuvers once her second set of signals had been blown, the argument is to the effect that, while she did indeed begin to turn to port, and her engine movements as shown by her bell books, and her headings as shown by her course recorder are consistent with that kind of movement, it is clear that she never actually made sternway.

It is necessary to visualize the ship's task as she gradually came abreast of the Barber shoreside dock which lay some 700 feet or so on her port hand, if she was in mid-channel when her circling maneuvers began. That is an assumption which can be fairly indulged, since we know that she had invited the tow to proceed in the starboard side of the channel.

The pilot Huus said that his purpose in blowing the one-blast signal (he called

it a courtesy signal) was to cause The Flushing to "come down on my starboard side". That if he had wanted the tow to hold back as the ship headed across to the Jersey side he would have "blown him a danger signal, and hoped he would not come up to me".

No one now argues that the one-blast signals blown by The Tuttle and accepted by The Flushing have any validity in rule or statute, but as both navigating officers knew what was intended and say that they acted accordingly, there seems to be no reason to discuss at length that which did not mislead or adversely affect the conduct of either. The relation so created cannot be thought of as the conventional overtaking situation as referred to in the Inland Rules, and a comment on the subject will be offered later.

The Tuttle's contemplated docking was not lightly entered into or ill-advisedly: The Sandy Hook pilot (Huss) was in charge of navigation until the making of berth at the Barber dock should be imminent, then the docking pilot from one of the Dalzell tugs would take over.

One of those tugs was alongside from the time that the tug and tow were passed about off the Perth Amboy ferry, and the other came into position at a later but unstated time. The absence of testimony as to when they began to function in pushing the bow of the tanker around so as to enable her to approach the dock breasting the tide, and the manner of their performance, renders the question of the sternway imputed to the tanker by the tug somewhat obscure.

We know that The Tuttle reduced her speed about as or shortly after she emerged from under the Outerbridge, but the exact time of the following engine movements as shown in the bell book of course does not tell us the respective positions of the ship when those movements were ordered. The ship's records as a whole indicate the moment of impact as 2.45½ o'clock P.M., her time, which is accepted for present purposes; reading backwords, the bell book shows:

| Hour | |
|---|---|
| 2.45½ | Stop. |
| 2.45 | ½ ahead. |
| 2.42½ | Slow astern and then stop. |
| 2.39½ | Full astern. |

Thus for four minutes the engines had been in backward movement, starting at 2.39½, but whether she was merely drifting in the tide prior to that interval does not appear; her brief says that just prior to 2.39½ "Her engines were half ahead for one minute, stopped for half a minute", which means that her forward motion at 2.39½ was greatly reduced, but what the effect upon her movement through the water was, in response to about 4 minutes of engine movement astern, is left to a conflict in testimony between the two groups of eye-witnesses, and that conflict seems presently incapable of entirely convincing resolution. Harriss says the ship would be dead in the water in 3 minutes under a "full astern" from "half ahead". I incline to the view that The Tuttle's forward inertia could not have been considerable at 2.39½ as her purpose was to circle around as has been stated; therefore, that the backing engine movements for 4 minutes probably imparted sufficient sternway to account for the striking, and for the testimony on that subject adduced by the tug whose witnesses say they observed such movement just prior to the moment of collision; at least I am satisfied that The Tuttle has not sustained the burden of proof of the negative which was alleged in her pleadings.

The evidence concerning The Tuttle's headings during the critical minutes before and after the striking, as shown by the course recorder, is helpful but not conclusive; if it is true that the ship made sufficient sternway to bring her into collision with The Rosebush, which I think the evidence must be taken to establish, her precise heading at the instant of striking does not tell us too much except that perhaps it tends to support the argument now relied upon—as distinguished from what the ship's officers seem to have intended to suggest—that the tow was not then even nearly parallel to the channel.

If the course recorder is to be wholly relied upon, it cancels out much that the ship's witnesses say they observed, both at the critical time and prior thereto; and so a choice must be made if any conclusion is to be arrived at.

As has been stated, I conclude that the tow was proceeding to pass astern of the tanker, in a course which was nearly along the easterly edge of the channel, and that such tailing to the west as was probably present was not too great to bar a clear passage if the ship had adhered to the undertaking to be implied from the exchange of one-whistle signals. That I understand to have been, that she would so maneuver as to keep clear astern at least enough water in the channel to admit of clearance of a tow 75 feet in width, moving in a 2 knot tide.

It will be recalled that this tow did not loom up out of the unknown, astern of the ship as the latter was preparing to cross to the Jersey shore. The ship knew the size and make-up of the tow, for she had passed ahead from almost alongside as their courses converged; she knew that the same force of tide would impel the tow as the ship herself; she knew that a wide margin of maneuverability lay with the ship; and lastly, she knew that there were shoal spots in the waters off the Barber dock which might require a certain delay in accomplishing the docking; and that a deftness of handling was needed that might involve backing and filling to avoid smelling bottom in spots even in a flood tide.

Awareness of these conditions must be read into The Tuttle's signals and her agreement with The Flushing that the latter should proceed with her tow, alongside the ship to starboard.

The tug of course was not beckoned to proceed into a situation of obvious peril, nor would she have been justified in so doing, merely because of the interchange of signals. I have been unable to discover in the evidence any showing that it was dangerous for The Flushing to go forward as she did at half speed after the interchange of signals, until The Tuttle was perceived to be moving astern after the tug herself had passed clear of the ship, as McVay and the other witnesses testify.

Then the alarm was blown by the tug and she stopped in the belief that the inevitable crash thus would be minimized. If it was an error in judgment, and I cannot say that the evidence so indicates, it was excusable as being in extremis not of the tug's doing.

The ship argues that the overtaking vessel necessarily assumed all incidents of that relationship to the tanker. I do not think it was an overtaking situation within the cases cited by The Tuttle. It was rather one in which The Tuttle, when well ahead, announced the intention to change her course in order to circle around, and head down stream; and also that she intended, in so doing, to leave room for the tow to pass her safely in the waters lying in the easterly half of the channel. In other words, it is by no means a case in which the leading vessel made an unexpected change of course, with which the following tug was required to reckon.

Among other things, The Tuttle twice blew 3 blasts to indicate that her engines were going full speed astern (33 Code of Fed.Reg. 312.03) when that was not the fact, since this was not true until 2.39½, as has been shown. The first turn to the port hand is said to have been at 2.38. Thereafter the actual backing signal at 2.39½ was not announced by 3 blasts, or any other signal. It is argued with more than plausibility for The Flushing, that if the ship had actually put her engines astern just prior to her first signal, and then proceeded to turn, the striking would probably have been avoided.

It has been intended in this discussion of the evidence to indicate the wide divergence between the facts residing in this record, and those found, for instance, in Socony No. 14—Worthington, 1928 A. M.C. 1361, The Holly Park 2 Cir., 39 F.2d 572, The Industry, 2 Cir., 29 F.2d 29, and The Lackawanna, 2 Cir., 119 F.2d 666, cited by The Tuttle, and which dealt with an overtaking situation as visualized by the Inland Rules. If The Tuttle had maneuvered as she might have, The Flush-

ing would never have overtaken her at all; she and her tow would merely have passed clear in waters which lay well astern, or even perhaps on the port hand of the ship.

Since the only issue of fact is the one which has been discussed, it seems that no itemized findings are required, but the ultimate one is hereby made that the collision occurred at the time in question, between the stern of The Tuttle and the port side forward of The Rosebush, as the result of the sternway being made by the former, which backed into the tow of The Flushing without warning.

This finding means that the faults attributed by The Tuttle to The Flushing in the impleading petition have failed since The Tuttle has not sustained her burden of proof in respect of those deemed to be in issue, namely, 3, 4, 5, 6, 7, 8, 9, 10 and 11.

As a conclusion of law, it follows that each libellant is entitled to the usual interlocutory decree, with costs, to be settled on notice.