IRA S. BUSHEY & SONS, Inc., v. STANDARD OIL CO. OF CALIFORNIA et al.

RED STAR BARGE LINE, Inc., v. STANDARD OIL CO. OF CALIFORNIA et al.

Nos. 204, 205, Docket 22278, 22279.

United States Court of Appeals Second Circuit.

Argued March 7, 1952.

Decided May 23, 1952.

Mark W. Maclay and Lyeth & Voorhees, all of New York City, for appellant.

Leo F. Hanan and Macklin, Speer, Hanan & McKernan, all of New York City, for Red Star Towing & Transp. Co.

Foley & Martin, New York City, Christopher E. Heckman, Edward J. Ryan, New York City, of counsel, for libellants.

Before L. HAND, AUGUSTUS N. HAND and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

The Standard Oil Company of California, the owner of the tanker, "Tuttle," appeals from two decrees in the admiralty, holding its vessel solely liable for a collision in the Kill van Kull, on April 1, 1947, between it and three barges in tow of the tug, "Flushing." The opinion of Byers, J., 99 F.Supp. 63, 69, states the facts and issues with care and detail and we shall assume an acquaintance with it in what we say. He held "that the tow was proceeding to pass astern of the tanker, in a course which was nearly along the easterly edge of the channel, and that such tailing to the west as was probably present was not too great to bar a clear passage if the ship had adhered to the undertaking to be implied from the exchange of one-whistle signals. That I un-

derstand to have been, that she would so maneuver as to keep clear astern at least enough water in the channel to admit of clearance of a tow 75 feet in width, moving in a 2 knot tide." He held that the situation was not an "overtaking" one under Article 24 of the "Inland Rules";[1] and we agree that it was not, at least before the tanker's first signal blast. It is not enough that a vessel is two points abaft another vessel's beam to make the first an "overtaking vessel"; she must be steaming at a greater speed so that if each keeps on at her existing speed, the vessel behind will pass the vessel ahead. After the tanker had passed the tow off the Perth Amboy docks, she continued at her higher speed until she was about a third of a mile below her projected turn to port opposite the Barber wharf, and for that reason, as we have said, the tow was not an "overtaking vessel." Had the tug known that the tanker meant to slow down and turn to port, we will assume, *arguendo*, that it would have been an "overtaking situation," for those "steady courses" which the rules presuppose, are not determined by the vessels' headings or speeds at any given moment, but by the future movements of each, so far as the other can reasonably forecast them.[2] In the case at bar McVay, who was in command of the tug, did not know that the tanker meant to turn to port and go to the Barber wharf until he heard her first single blast. However, the tug did then assume a duty "to keep out of the way," because that was the inevitable meaning of the exchange; and possibly also because Article 24 then did come into effect. Since the duty did not attach before, the tug had not been at fault, even though, as the tanker asserts, the tow was then on the west side of the channel. We do not forget that, even if not an "overtaking vessel," she would still have been on the wrong side of a narrow channel; but that was a fault of which the tanker, a faster vessel which had already passed, cannot take advantage. The tow's position had been apparent to the tanker before she suggested the maneuver, and she was bound to shape her navigation accordingly.[3]

█ █ The question therefore is whether the tug did all that was required "to keep out of the way" after she replied to the tanker, and the answer depends largely on where the tow then was. The judge found that it was in midstream when under the bridge, that at the time of the collision it had moved over into the east half of the channel, and that "such tailing to the west as was probably present was not too great to bar a clear passage" for the tow. If those findings are not "clearly erroneous," the appeal must fail; but the tanker insists that they are. She says that the "course recorder" and the log books indubitably prove that her stern could not have been more than 133 feet from the west edge of the channel and that the tug must have been in the west half and tardy in her efforts to "keep out of the way." It is true that, even were the tanker where she says, a question might still be raised whether, since the tug was not required to act until after the exchange and since her earlier position had not been a fault, the tanker proved that by proper navigation she could have swung clear. However, we shall not press that doubt because we think that the judge's findings should stand anyway. When they were not reading from the "recorder" graph the testimony of the tanker's own witnesses was that at the moment of collision her angle to the thread of the channel was substantial. The master remembered it as 90 degrees; one pilot and an A.B. thought it had been 45 degrees; the other pilot in a diagram put it at about 30. The tug's

1. § 209, Title 33, U.S.Code.

2. The Hallgrim, 2 Cir., 20 F.2d 720; Commonwealth & Dominion Line Ld. v. United States, 2 Cir., 20 F.2d 729; Bull S. S. Co. v. United States, 2 Cir., 34 F.2d 614; The Transfer No. 6, 2 Cir., 45 F. 2d 571; Construction Aggregates Co. v. Long Island R. Co., 2 Cir., 105 F.2d 1009; National Motorship Corp. v. Pennsylvania R. R. Co., 2 Cir., 160 F.2d 510.

3. The La Bretagne, 2 Cir., 179 F. 286; The Perseverance, 2 Cir., 63 F.2d 788, 790; The Syosset, 2 Cir., 71 F.2d 666, 668; The Bellhaven, 2 Cir., 72 F.2d 206; The S. S. Deutschland, 2 Cir., 90 F.2d 454, 456; Socony-Vacuum Oil Co. v. Smith, 5 Cir., 179 F.2d 672, 676.

master, McVay, remembered it as 90. It would certainly be reasonable to say that the proper mesne of these should not be taken at less than 45 degrees; and if that was true, the tanker probably occupied most of the channel. Such doubts as arise depend upon the time of the collision and the recorded heading of the tanker at that moment. Barnett was the third mate and was the only one on board, who made any record of the time, which he did by putting an asterisk opposite the figures "45½" in the "Deck Bell Book." He had not been aware of the collision when it happened and learned of it only from Harriss, the second mate, who was at the stern, and who, although he did not profess to have observed the time, called up to Barnett that there had been a collision. Barnett made the entries in the "Deck Bell Book" by getting the time from the clock when the pilot told him of a change in helm or in speed. He made the proper symbol for a stop signal at "45½," when he sent the pilot's order below to the engine room to stop; but nothing fixes that as the moment of collision except his testimony, coupled with that of Hill, the tanker's master, that he too saw the collision and looked at the clock.

At 2.42 the ship had been at full speed astern for two minutes and a half and her engines were then stopped until 2.48 except for thirty seconds "slow astern" at 2.43½ and thirty seconds "half ahead" at 2.45. Therefore, if the collision was at 2.45½ the engines were not used for two and a half minutes after the tanker had struck one barge with sufficient violence to break the starboard fast from her to the barge behind her, and to swing that barge around almost parallel with the tanker. Even though we assume that the sternway had been run off by 2.45½ and that the collision was therefore owing to the small space left for the tow, and not to the tanker's backing, for two and a half minutes after the collision she did not put her engines ahead to clear herself away from the tow. That is of course possible; but it appears to us unexpected inaction. On the other hand, if the collision was at 2.48, when an order, "slow ahead," was given, it is possible that Barnett put his asterisk opposite the wrong figure; and, if the collision did happen at 2.48, the "course recorder" shows that at that time the tanker was at an angle of 45 degrees to the channel and she would have substantially blocked the 400 foot channel, as we have said. In view of these possibilities it does not seem to us that the combination of the log books and the "course recorder" is so unimpeachable a contradiction of the unanimous testimony of the witnesses that we are required to hold "clearly erroneous" a finding which accepted the testimony. We do not wish to throw doubt upon the reliability of such instruments as the "course recorder," but when an issue depends not upon it alone, but must be supplemented by testimony, as it must be here, the conflict in the end becomes one between witnesses. Since we are unwilling to reverse the findings, it follows that the decrees must be affirmed.

Decrees affirmed.